**Russell REDHOUSE, Jr.,**
**Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 83–7440.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 16, 1984.

Decided March 20, 1984.

Zayle A. Bernstein, Ft. Lauderdale, Fla., for petitioner-appellant.

Gary Allen, Dept. of Justice, Washington, D.C., for respondent-appellee.

Before ANDERSON, SCHROEDER, and ALARCON, Circuit Judges.

ALARCON, Circuit Judge:

Russell Redhouse Jr. (Redhouse or taxpayer), a limited partner in Tennessee Coal Resources, Ltd. (TCR), filed a petition in the United States Tax Court seeking redetermination of deficiencies in his federal income tax for the 1976 taxable year. The Tax Court consolidated Redhouse's case with those of other TCR partners and sustained the Commissioner's determination of deficiencies. *Wendland v. Commissioner,* 79 T.C. 355 (1983). Redhouse, a California resident, here appeals the decision entered against him pursuant to I.R.C. § 7482. The other partners, all Florida residents, have filed an appeal in the Eleventh Circuit.

In this appeal, Redhouse challenges the retroactive application of Treas.Reg. § 1.612–3(b)(3), T.D. 7523, 1978–1 C.B. 192, to a coal mining lease acquired on December 31, 1976. We find such application permissible and therefore affirm the decision of the Tax Court.

## FACTS

Redhouse is a limited partner in TCR, a partnership formed on December 30, 1976. On December 31, 1976, TCR acquired a coal mine by transferring $650,000 cash and a nonrecourse note for $2,350,000 to L.D. Rowlette, the lessor of the mine. TCR characterized the entire amount as an advance royalty and claimed a deduction of $3,000,000 on its 1976 return. The Commissioner disallowed the deduction, because no coal was mined in 1976. The Commissioner relied on an amendment to Treas.Reg. § 1.612–3(b)(3) that provided in pertinent part that advanced royalties are deducted from gross income in the year the mineral is produced. T.D. 7523, 1978–1 C.B. 192.

The taxpayer had notice of the proposed amendment before obligating himself to the transaction. On October 29, 1976, the Internal Revenue Service (IRS) issued a news release announcing the forthcoming publication in the Federal Register of proposed amendments affecting mineral leases entered into on or after October 29, 1976. The IRS also announced the suspension of Rev.Rul. 70–20, 1970–1 C.B. 144 (advance minimum royalties, required for first nine years of lease, may be deducted in the year paid or accrued), and Rev.Rul. 74–214, 1974–1 C.B. 148 (lump-sum payment, recoupable at specified rate in later years, is deductible when paid or accrued). News Release IR–1687, Oct. 29, 1976. A copy of the proposed amendments was attached to the news release. The proposed amendments were published in the Federal Register on November 2, 1976, with an announcement that public hearings would be held on November 30, 1976, and that written comments must be submitted by November 23, 1976. These announcements were also published in the November 15, 1976, issue of the Internal Revenue Bulletin. The final version of the amendments (with no significant changes from the proposed amendments) was published in the Federal Register on December 19, 1977. Also on December 19, 1977, Rev.Rul. 77–489, 1977–2 C.B. 177, announced the revocation of Rev.Rul. 70–20 and Rev.Rul. 74–214.

## DISCUSSION

### I.

I.R.C. § 7805(b) gives the Secretary of the Treasury the discretion to limit

the retroactive effect of treasury rules or regulations. Thus, treasury regulations are ordinarily retroactive to the effective date of the statute to which they relate, unless the Secretary limits such retroactive application. *See Manocchio v. Commissioner,* 710 F.2d 1400, 1403 (9th Cir.1983) (§ 7805(b) establishes presumption that rulings are retroactive). The decision of the Commissioner, the delegate of the Secretary, to make a ruling or regulation retroactive is reviewed for an abuse of discretion. *Automobile Club of Michigan v. Commissioner,* 353 U.S. 180, 184, 77 S.Ct. 707, 710, 1 L.Ed.2d 746 (1957) (upheld retroactive revocation of ruling exempting club from income taxes); *Manocchio,* 710 F.2d at 1402 (upheld retroactive application of a revenue ruling disallowing deduction of reimbursed flight training expenses).

### A.

Courts have declined to give retroactive effect to regulations that change settled law. *E.g., Helvering v. R.J. Reynolds Tobacco Co.,* 306 U.S. 110, 59 S.Ct. 423, 83 L.Ed. 536 (1939) (Treasury cannot retroactively amend long-standing regulation, which acquired force of law when underlying statute was repeatedly reenacted by Congress without change).

Contrary to Redhouse's contention that the regulations have permitted advanced royalty deductions such as his since 1940 based on statutes going back before the 1939 codification of the internal revenue laws, none of these statutes or regulations favored the taxpayer's position. Prior to the 1977 amendment, regulation section 1.612–3(b) and its ancestors [1] provided for the deduction of *annual* advanced royalty payments and did not refer to a single, lump-sum payment. As Redhouse cited to us, the 1940 amendment to Article 23(m)–10 of Regulations 101 (26 C.F.R. § 9.23(m)–10 (Supp.1939)) stated in pertinent part:

**1.** Section 611 of the current Internal Revenue Code was derived from Section 23(m) of the Internal Revenue Code of 1939, which was a codification of the then-existing internal revenue laws. In 1939, the regulations that prescribed rules relative to the allowance of deple-

(e) If a lessee or other owner of operating rights in one or more mineral properties is required to pay royalties on a specified number of units of mineral annually, whether or not extracted within the year, and may apply any amounts paid on account of units not extracted within the year against the royalty on mineral thereafter extracted, he may at his option treat the advanced royalties so paid or accrued in either one of the following manners:

(1) As deductions from gross income for the year the advanced royalties are paid or accrue; or

(2) As deductions from gross income for the year the mineral product in respect of which the advanced royalties were paid is sold.

Substantially the same language continued in effect through the 1960 amendment:

(b) *Advanced royalties.*—(1) If the owner of an operating interest in a mineral deposit or standing timber is required to pay royalties on a specified number of units of such mineral or timber annually whether or not extracted or cut within the year, and may apply any amounts paid on account of units not extracted or cut within the year against the royalty on the mineral or timber thereafter extracted or cut, ...

(3) The payor, at his option, may treat the advanced royalties so paid or accrued in connection with mineral property as follows:

(i) As deductions from gross income for the year the advanced royalties are paid or accrued, or

(ii) As deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid, is sold.

Treas.Reg. § 1.612–3, T.D. 6446, 1960–1 C.B. 208, 226–27.

tion deductions were made applicable to the Internal Revenue Code by Treasury Decision 4885 (1939–1 C.B. 396) and added to the Code of Federal Regulations as section 9.23(m)–10 in the 1939 supplement.

It was not until 1974 that a revenue ruling interpreted the regulation to allow deduction of a single payment made in advance of mining. Rev.Rul. 74–214, 1974–1 C.B. 148. Even then, the ruling was not without ambiguity. Pomerance, *Coal-leasing arrangements offer substantial tax-shelter benefits,* 44 J.Tax'n 350, 351 & nn. 5–6 (1976) (unclear to what extent coal reserves must exceed recoupment and by what date recoupment must be complete); *see also* 44 J.Tax'n 381, 382 (1976) (warning that IRS may suspend the revenue rulings to reconsider its position).

The 1977 amendment still permitted deduction of advanced minimum royalty payments but "require[d] that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount." Treas.Reg. § 1.612–3(b)(3), T.D. 7523, 1978–1 C.B. 192. Thus, the 1977 amendment to the regulation revoked the construction that the 1974 revenue ruling gave to the 1960 amended regulation and returned to the intent of the 1960 amended regulation (as well as earlier versions) that payments be made on an annual basis. The 1974 revenue ruling was not a rule of long-standing such that the government should be estopped from changing it retroactively. Furthermore, it cannot be said that Congress approved the revenue ruling because there was no change in the pertinent underlying statutory law since 1974, and revenue rulings have no force of law. *Dixon v. United States,* 381 U.S. 68, 73, 85 S.Ct. 1301, 1304, 14 L.Ed.2d 223 (1965). The 1977 amendment did not change settled law.

### B.

■ A regulation may not be applied retroactively, if the result would be unduly harsh to a particular taxpayer. *Schuster v. Commissioner,* 312 F.2d 311, 317 (9th Cir. 1962) (recognizing that in rare situations Commissioner may be estopped by detrimental reliance of taxpayer).

■ Redhouse acquired his limited partnership interest as a result of a confidential offering memorandum dated November 12, 1976. The memorandum specifically referred to the IRS news release of October 29 and the risk that the advanced royalty payment would not be deductible in the 1976 taxable year. Since the taxpayer had notice of the proposed amendments before he entered the transaction, he did not suffer "a profound and unconscionable injury." 312 F.2d at 317. This taxpayer was not relying to his detriment on settled law or on a specific ruling in his favor; he was relying on suspended rulings and on the invalidity of a proposed regulation.

### C.

■ Redhouse argued that the retroactive application of the amendment to the regulation denied him due process of law. The abuse of discretion standard (see discussion above) is akin to a due process inquiry. The taxpayer had no legitimate expectation that the deduction would be allowed after the Commissioner withdrew the revenue rulings. There was no abuse of discretion and no deprivation of due process.

### II.

The Administrative Procedure Act of 1946 (APA) § 4, 5 U.S.C. § 553(d), requires all government agencies to give notice of "proposed rule making" by publication in the Federal Register 30 days before the effective date of the rule. This requirement does not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" or "for good cause." 5 U.S.C. § 553(b)(A)–(B). The Treasury ordinarily follows a notice and hearing procedure for all rules whether interpretative or not. Treas.Reg. § 601.601(a)(2)–(3).

### A.

■ Redhouse contends that the amended regulation is invalid, because it was not published in the Federal Register in its final form 30 days before its effective date.

Redhouse refers us to *Wing v. Commissioner,* 81 T.C. 17 (1983) as authority for the proposition that this regulation was legislative in character and subject to the notice requirement of 5 U.S.C. § 553(d). 81 T.C. at 28. *Wing* also held that any noncompliance with the notice requirement was technical and the amendment was valid. 81 T.C. at 30. Furthermore, *Wing* stated that its decision was controlled by *Wendland,* the very case now before us on review. 81 T.C. at 29.

It is doubtful that treasury regulations need to comply with the 30-day notice requirement. The specific statute giving the Secretary of the Treasury discretion to apply statutes retroactively (I.R.C. § 7805(b)) would in any conflict take precedence over the general notice statute (5 U.S.C. § 553(d)). *Wing,* 81 T.C. at 30 n. 17 (quoting *Bulova Watch Co. v. United States,* 365 U.S. 753, 758, 81 S.Ct. 864, 867, 6 L.Ed.2d 72 (1961) (specific controls general without regard to priority of enactment)).

Even assuming that the 30-day notice requirement applies to treasury regulations, the amendment at issue here falls under the "interpretative rule" exception to the requirement. Although the original depletion regulations, being promulgated pursuant to the express statutory authority of I.R.C. § 611(a), are arguably legislative in character, this amendment to those regulations was issued in order to revoke an erroneous interpretation of the earlier regulation. The erroneous interpretation was based upon two revenue rulings that gave a broad construction to an ambiguity in the regulation. Revenue rulings merely represent the opinion of the Commissioner and are therefore classic examples of interpretative rules. *Wing,* 81 T.C. at 27. The amendment, changing the Commissioner's revenue rulings, was also of an interpretative nature.

### B.

■ Redhouse also contends that the Tax Court lacks subject matter jurisdiction to decide whether the regulation complied with the APA and that its ruling on this matter constituted a deprivation of due process.

■ The United States Tax Court is a legislative court under Article I of the United States Constitution. I.R.C. § 7441. It has jurisdiction to determine the correct amount of a deficiency. I.R.C. § 6214.[2] The Tax Court here was not considering the APA issue in the abstract but in connection with the assessment of a deficiency. In order to determine the correct amount of a deficiency, the court must be able to determine whether or not the tax statutes, regulations and rules are valid. Furthermore, if the Tax Court lacked jurisdiction to pass on the validity of the tax rules, deficiencies might then be determined according to invalid rules. Having deficiencies determined according to valid rules does not deprive taxpayers of due process. The taxpayer's claim is without merit.

2. At oral argument, the taxpayer for the first time attacked the constitutionality of the Tax Court. This argument was untimely. We note, however, that the creation of the Tax Court was constitutional. *Ex Parte Bakelite Corp.,* 279 U.S. 438, 451–52, 49 S.Ct. 411, 413, 73 L.Ed. 789 (1929) (Congress may create legislative courts); *Nash Miami Motors, Inc. v. Commissioner,* 358 F.2d 636 (5th Cir.), *cert. denied,* 385 U.S. 918, 87 S.Ct. 227, 17 L.Ed.2d 142 (1966) (Tax Court is constitutional).

In his reply brief, citing *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (broad grant of jurisdiction to bankruptcy courts declared unconstitutional), the taxpayer contends that the Tax Court "overstepped its jurisdictional boundary in ruling on subject matter under 5 U.S.C. § 706 [scope of judicial review of agency action]." Unlike bankruptcy courts that were set up as adjuncts to Article III district courts (458 U.S. at 63 n. 13, 102 S.Ct. at 2867 n. 13), the Tax Court is a legislative court with limited jurisdiction to rule on deficiencies assessed by the government on its taxpayers. The creation of the Tax Court was within the realm of congressional power. 458 U.S. at 67–70 & n. 22, 102 S.Ct. at 2869–70 & n. 22 (tax cases involve public rights and may be adjudicated in a legislative court). The Tax Court was not reviewing agency action in a declaratory relief action under 5 U.S.C. § 706; it was ruling on the amount of a deficiency owed under the specific statutory authorization of I.R.C. § 6214.

### III.

Based on the foregoing analysis, we conclude that the retroactive application of Treas.Reg. § 1.612–3(b)(3), T.D. 7523, 1978–1 C.B. 192, was not an abuse of the Secretary of the Treasury's discretion under I.R.C. § 7805(b). The 30-day notice requirement of 5 U.S.C. § 553(d) was not applicable to this interpretative regulation. The decision of the Tax Court is AFFIRMED.