Jimmie J. and Bonnie M. WARD, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE SERVICE, Respondent-Appellee.

No. 85-7038.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 5, 1986.

Decided March 18, 1986.

John Patrick Kelly, Santa Ana, Cal., for petitioners-appellants.

Francis M. Allegra, Dept. of Justice, Washington, D.C., for respondent-appellee.

Before KENNEDY, SKOPIL, and ALARCON, Circuit Judges.

ALARCON, Circuit Judge:

Appellants Jimmie J. and Bonnie M. Ward (hereinafter the Wards) appeal a judgment from the tax court upholding the Internal Revenue Service's (IRS) determination that their minimum royalty payment of $22,500 for unmined coal in 1977 was not deductible under Treas.Reg. § 1.612–3(b)(3), T.D. 7523, 1978–1 C.B. 192. We affirm.

## PERTINENT FACTS AND PROCEDURAL HISTORY

On December 21, 1977, Jimmie J. Ward entered into a mining lease (hereinafter lease) with Wyoming and Western Coal Reserves, Inc. (hereinafter W & W), the lessor. The lease granted the Wards certain rights to enter and mine coal on a parcel of land in Wyoming. W & W warranted that the premises contained at least 72,000 tons of recoverable coal. The lease was for a term of eight years plus the balance of 1977, with the option to extend on a yearly basis as required to exhaust the coal.

The lease required that the Wards pay a royalty equal to the greater of (1) 15% of the "net pit price" plus 50¢ per ton of 2,000 pounds of run-of-mine merchantable coal leased or (2) $3 per net ton of run-of-mine merchantable coal sold from the premises. In addition, the Wards were obligated to pay a royalty of $2.50 per net ton of the initial 36,000 tons sold or mined, removed and marketed.

The lease provided that the Wards would pay a "minimum annual royalty" of $22,-500. It is this royalty payment which is at issue in this case. For the first year's royalty, one quarter was due at the inception of the lease and three quarters were due by December 31, 1977. Each of the remaining seven annual royalty payments were due on December 31 of the following years. These minimum royalty payments were recoupable at a rate of $2.50 per ton of coal sold or mined, removed and marketed.

The Wards and W & W added an "Addendum to Mining Lease" (hereinafter Ad-

dendum) when the lease was signed. The Addendum provided that the "minimum annual royalty payments" due for the years 1979 and thereafter could be paid by cash or note. If payment was to be by note, the Addendum provided the required terms of the note. The note would be nonrecourse. Payment was to be made only from coal sold or mined, removed and marketed, in. excess of the initial 18,000 tons, at a rate of $3 per ton. The total outstanding balance was due on December 31, 1997. If not paid then, W & W's only recourse would be to foreclose on the Wards' interest in the lease.

On December 21, 1977, the Wards also entered into a sales contract with Coal and Mineral Leasing and Development Corporation (hereinafter C & M). Under this sales contract, C & M agreed to buy 18,000 tons of coal reserves at $3.50 per ton for a total purchase price of $63,000. According to the sales contract, the terms created a "carved out production payment." Payment was to be made only from coal sold or mined, removed and marketed. The total outstanding balance was due on December 31, 1987, however, C & M could extend the due date until December 31, 1997. At that time, the Wards could extend the due date further or cancel C & M's coal interest.

No coal was mined from the leased premises in 1977. The Wards paid $22,500 in cash to W & W that year as a minimum royalty payment.[1]

The Wards filed a joint tax return for 1977. They indicated that their mining business was being conducted on a cash method of accounting. They reported a $22,546 loss on the business, $22,500 in royalties and $46 in auto expenses which they claimed as a deduction.

The Commissioner of the Internal Revenue Service notified the Wards of a deficiency in their income tax of $7,680. The Commissioner asserted that the $22,546 deduction was not allowable under any provisions of the Internal Revenue Code.

The tax court sustained the Commissioner's disallowance of the deduction from which the Wards now appeal.

### DISCUSSION

The Wards contend that their minimum royalty payment of $22,500 to W & W for coal production for the year 1977 is tax deductible under Treas.Reg. § 1.612–3(b)(3). Alternatively, they argue that section 1.612–3(b)(3) is invalid. We find both contentions meritless.[2]

1. ALLOWANCE OF THE TAX DEDUCTION UNDER TREAS.REG. § 1.612–3(b)(3)

■ The Wards first contend that Treas. Reg. § 1.612–3(b)(3) allows the $22,500 deduction they claimed as royalty payments on their 1977 tax returns.[3]

The Wards made an advanced royalty "payment" of $22,500 in 1977. Under sec-

1. The facts regarding the Wards' actual payment of the first year's royalty are not clear. They apparently borrowed an amount equal to one quarter of the payment ($5,625) from W & W in return for a promissory note executed along with the lease on December 21, 1977. The Wards had written a personal check for $5,625 to W & W on December 2, 1977. They borrowed the remaining three quarters ($17,875) from C & M under the sales contract executed on December 21, 1977. A nonrecourse promissory note was executed in conjunction with the sales contract. The note was secured only by the Wards' coal interest in the lease and not due, absent coal production, until December 31, 1997. C & M had written a check for $17,875 to the Wards on December 6, 1977. The Wards apparently gave the check to Joseph R. Laird, who had signed the promissory note as president of C & M. The check was paid by C & M's bank on December 7, 1977.

In sum, the Wards appear to have paid one quarter of the minimum royalty payment with a note for which they are liable. The other three quarters appears to have been paid with money borrowed against a nonrecourse note similar to the notes which are the subject of this appeal.

2. Because each issue in this case is a matter of law, we review de novo. United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.) (en banc), cert. denied, — U.S. —, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

3. Treas.Reg. § 1.612–3(b)(3) reads as follows: The payor shall treat the advanced royalties paid or accrued in connection with mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold. For purposes of the preced-

tion 1.612–3(b)(3) advanced royalties paid or accrued can be deducted for the year in which the minerals are "sold." 26 C.F.R. § 1.612–3(b)(3) (1985). In the case of royalties paid in advance of production, "sold" is defined as "when the mineral is produced (i.e., when a mineral product first exists)." *Id.* No coal was produced in 1977 from the Wards' subleased property.

Section 1.612–3(b)(3) also provides, however, that if the lease contains a "minimum royalty provision," advanced royalties can be deducted in the year in which they are paid or accrued, whether or not minerals are produced. *Id.* The section defines "minimum royalty provision" as a provision which *"requires* that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of at least 20 years...." *Id.* (emphasis added).

Thus, whether the Wards could claim the 1977 royalty payment as a deduction depends in turn on whether their sublease agreement contained a minimum royalty provision requiring a payment of $22,500 paid at least annually over the life of the lease. As set forth above, the Addendum provides that if the Wards elect to pay by note, the note could be a nonrecourse note secured only by the Wards' interest in the coal.

In *Maddrix v. Commissioner,* 780 F.2d 946 (11th Cir.1986), the Eleventh Circuit adopted the reasoning in *Wing v. Commissioner,* 81 T.C. 17 (1983) and held that nonrecourse notes secured only by a taxpayer's mineral interest do not qualify under the exception within section 1.612–3(b)(3).[1] In *Maddrix* and *Wing* deductions for advanced royalties paid under an agreement substantially similar to that set in the Addendum were disallowed. The Wards' attempt to distinguish their royalty agreement from the one before the tax court in *Wing* is unpersuasive.[5]

The agreement in *Wing* called for a payment of $60,000 in advanced royalties, $10,-

---

ing sentence, in the case of mineral sold before production the mineral product is considered to be sold when the mineral is produced (i.e., when a mineral product first exists). However, in the case of advanced mineral royalties paid or accrued in connection with mineral property as a result of a minimum royalty provision, the payor, at his option, may instead treat the advanced royalties as deductions from gross income for the year in which the advanced royalties are paid or accrued. See section 446 (relating to general rule for methods of accounting) and the regulations thereunder. For purposes of this paragraph, a minimum royalty provision requires that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount. For purposes of the preceding sentence, in the case of a lease which is subject to renewal or extension, the period for which it can be renewed or extended shall be treated as part of the term of the original lease. For special rules applicable when the payor is a sublessor of coal or domestic iron ore, see paragraph (b)(3) of § 1.631–3. Every taxpayer who pays or accrues advanced royalties resulting from a minimum royalty provision must make an election as to the treatment of all such advanced royalties in his return for the first taxable year ending after December 31, 1939,

in which the advanced royalties are paid or accrued. The taxpayer's treatment of the advanced royalties for the first year shall be deemed to be the exercise of the election. Accordingly, a failure to deduct the advanced royalties for that year will constitute an election to have all the advanced royalties treated as deductions for the year of the sale of the mineral product in respect of which the advanced royalties are paid or accrued. See section 7807(b)(2). For additional rules relating to elections in the case of partners and partnerships, see section 703(b) and the regulations thereunder. The provisions of this subparagraph do not allow as deductions from gross income amounts disallowed as deductions under other provisions of the Code, such as section 461 (relating to general rule for taxable year of deduction), section 465 (relating to deductions limited to amount at risk in cause of certain activities), or section 704(d) (relating to limitation on allowance to partners of partnership losses).

4. A nonrecourse note is "secured only by the mineral interest itself, [and thus a creditor] could only look to the taxpayer's interest in the minerals themselves for payment of taxpayer's obligation." *Maddrix,* 780 F.2d at 950.

5. The Wards' brief was submitted before *Maddrix* was decided. However, since the facts in *Maddrix* are similar to those in *Wing,* the Wards' argument would apply to both.

000 by cash and $50,000 by nonrecourse note secured by the taxpayer's mineral interests. *Wing*, 81 T.C. at 20. This payment was to be applied as minimum annual royalty payments of $6,000 over the ten year life of the lease. The agreement in *Maddrix* called for annual minimum royalties of $300,000. At the commencement of the sublease, $2,540,000 of the annual minimum royalty was to be paid, $590,000 in cash and $1,950,000 in nonrecourse notes secured only by the taxpayer's interest in the coal. *Maddrix*, 780 F.2d at 947.

The Wards correctly note that in *Wing* a lump sum payment of the total amount due was to be paid in advance. Therefore, substantial payment by nonrecourse notes was compelled. *Wing*, 81 T.C. at 20. The Wards argue that, under their sublease, minimum royalty payments were to be paid annually. Unlike *Wing*, the Wards' Addendum did not provide for a lump sum payment to be applied against *future* years. The Wards also point out that the Addendum merely provided an *option* for payment by nonrecourse note. Payment by means of a nonrecourse note was not required.

The Wards' argument ignores the underlying rationale in *Wing*. By tendering a nonrecourse note, actual payment is so speculative that nothing in fact is required to be paid annually. *Wing*, 81 T.C. at 38–42. *Maddrix* termed such an arrangement "illusory." *Maddrix*, 780 F.2d at 951. An option to tender a nonrecourse note is completely inconsistent with the requirement of section 1.612–3(b)(3) that a minimum royalty payment be *paid* under the taxpayer's sublease. The Wards argue that the note option simply provides an alternative method of payment. It is clear that an option to pay by nonrecourse note secured only by the mineral interest in question would give the taxpayer an option to pay nothing.

Under section 1.612–3(b)(3) as applied in *Maddrix* and *Wing*, subleases for mineral extraction which are payable by nonrecourse notes are not deductible.

## 2. VALIDITY OF THE 1977 AMENDMENT TO TREAS.REG. § 1.612–3(b)(3)

The Wards alternatively contend that the 1977 amendment of Treas.Reg. § 1.612–3(b)(3), under which the IRS disallowed their deduction, was invalidly promulgated. They insist that earlier versions of section 1.612–3(b)(3) should be applied to their transaction.[6] The Wards assert that the

---

**6.** The Wards' arguments are not very clear. They are apparently saying that they relied on the original version of section 1.612–3(b)(3) and its 1974 revenue ruling or the proposed amendment which was first announced on October 29, 1976 and published in the Federal Register on November 2, 1976.

The original version of section 1.612–3(b)(3), in effect until October 29, 1976, read in pertinent part, as follows:

(3) The payor, at his option, may treat the advanced royalties so paid or accrued in connection with mineral property as follows:

(i) As deductions from gross income for the years the advanced royalties are paid or accrued, or

(ii) As deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid, is sold.

The 1974 revenue ruling interpreted this to allow deduction of a single payment made in advance of mining. Rev.Rul. 74–214, 1974–1 C.B. 148. *See Redhouse v. Commissioner*, 728

F.2d 1249, 1252 (9th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 506, 83 L.Ed.2d 397 (1984).

The proposed amendment of section 1.612–3(b)(3) read, in pertinent part:

(3) The payor shall treat the advanced royalties so paid or accrued in connection with mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties are paid or accrued, is sold. However, in the case of advanced royalties paid or accrued in connection with mineral property as a result of a minimum royalty provision, the payor at his option, may instead treat the minimum royalty payments as deductions from gross income for the year in which the minimum royalties are paid or accrued. For the purposes of this paragraph, a minimum royalty provision requires that substantially uniform royalty payments be made at least annually over the life of the lease. . . .

The final version of the 1977 amendment as adopted only differed, in pertinent part, from the proposal in that the following definition of

1977 amendment is invalid for five reasons. First, the amendment's inclusion of the word "sold" to mean "produced" is contrary to the meaning of the previous versions, is redundant, and in effect eliminates advanced royalties. Second, the IRS abused its discretion under I.R.C. § 7805(b) by applying the 1977 amendment retroactively. Third, the final version of the amendment was not published in the Federal Register as required by the Administrative Procedure Act § 4, 5 U.S.C. § 553(d) (1976). Fourth, under the legislative reenactment doctrine, the administrative practice had acquired the force of law under the prior amendments and therefore only Congress could change section 1.612–3(b)(3). Fifth, neither the proposed or final version of the amendment was published in the Internal Revenue Bulletin in accordance with I.R.S. Statement of Procedural Rules, 26 C.F.R. § 601.601(d) (1986). These contentions lack merit.·

### a. DEFINING "SOLD" TO MEAN "PRODUCED"

■ The Wards argue that the inclusion of the definition of "sold" to mean the time when the mineral is "produced" in the final version of the 1977 amendment makes it invalid. Treas.Reg. § 1.612–3(b)(3), T.D. 7523, 1978–1 C.B. 192. They contend that this definition makes it impossible properly to deduct advanced royalties unless the agreement is a *production* payment. The Wards reason that since this form of payment is already covered by the tax laws, the 1977 amendment is redundant and eliminates deductions for advanced royalties based on unmined (and thus unproduced) minerals.

The Wards have misinterpreted the amendment. The purpose of the amend-

ment is to encourage the actual mining (i.e., production) of minerals.[7] Thus, it allows for deductions generally when the minerals have been removed from the ground. However, it is also possible to deduct royalty payments in advance under the final amendment to section 1.612–3(b)(3). The amendment provides for annual deductions of advance minimum royalty payments in the year they are paid or accrued However, this exception only applies if the minimum payments are *required* to be paid at least annually over the life of the lease or 20 years. The Wards were unable to qualify for this exception because their agreement did not require annual *payments*. As discussed above, a nonrecourse note does not constitute payment. However, the fact that the Wards have failed to obligate themselves to make annual minimum *payments* does not mean that this deduction is not available to others who comply with the requirements of section 1.612–3(b)(3) as interpreted in *Maddrix* and *Wing*. The Wards' contention that the revision eliminates advanced royalty payments is meritless.

### b. RETROACTIVE APPLICATION

■ The Wards argue that retroactive application of the 1977 amendment of Treas.Reg. § 1.612–3(b)(3) to their 1977 minimum royalty payment was improper. This argument is also devoid of merit.

The IRS did not apply the 1977 amendment retroactively in this case. The final version of the 1977 amendment was formally adopted on December 14, 1977 and published in the Federal Register on December 19, 1977. *See Redhouse*, 728 F.2d 1249, 1250 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 506, 83 L.Ed.2d 397 (1984); *Wing,*

---

"sold" in the first sentence was inserted after that sentence:
> For the purposes of the preceding sentence, in the case of mineral sold before production the mineral product is considered to be sold when the mineral is produced (i.e., when a mineral product first exists).

*See Wing,* 81 T.C. at 22 n. 7.

Whichever previous version the Wards relied on is immaterial. The key issue is whether the 1977 amendment, as adopted, is valid.

7. The amendment to section 1.612–3(b)(3) is designed to promote mineral production in two ways. A deduction for advance royalties can be made if there is actual production. A deduction for advance royalties can also be made, if there is a valid "minimum royalty provision." The purpose of the "minimum royalty provision" is to incur an actual liability so as to provide impetus for production. *See Wing,* 81 T.C. at 38 n. 30.

81 T.C. at 24. The Wards signed their sublease and Addendum two days later, on December 21, 1977. Thus, the 1977 amendment was applied prospectively to the Wards' transaction, not retrospectively. Because the Wards are unaffected by any retroactive application of this regulation, they have no standing to raise this issue on appeal. *See Massachusetts v. Mellon,* 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923) (holding that a taxpayer seeking to invalidate a law must have sustained a direct injury as a result of the law's enforcement in order to have standing). Moreover, we rejected the retroactivity argument on its merits in *Redhouse. Redhouse,* 728 F.2d at 1251–52.

c. COMPLIANCE WITH 5 U.S.C. § 553(b) AND (d) OF THE ADMINISTRATIVE PROCEDURE ACT

■ The Wards claim that the failure of the IRS to comply with the Administrative Procedure Act § 4, 5 U.S.C. § 553(b), (d) in promulgating the 1977 amendment of Treas.Reg. § 1.612–3(b)(3) invalidates the amendment. Section 553(b) requires that notice of a regulation be given by publishing it in the Federal Register. Section 553(d) requires that it be published not less than 30 days before its effective date. This requirement does not apply to interpretive rules. 5 U.S.C. § 553(b)(A), (d)(2); *Redhouse,* 728 F.2d at 1252.

In *Redhouse,* we held that the 1977 amendment fell into the "interpretive rule" exception to the notice requirement. *Redhouse,* 728 F.2d at 1253. The fact that the final version of the 1977 amendment was not published 30 days prior to its effective date does not invalidate the amendment.

### d. LEGISLATIVE REENACTMENT DOCTRINE

■ The Wards contend that the 1977 amendment is invalid under the legislative reenactment doctrine. Under this doctrine, long standing court or agency interpretations of a statute are deemed to have been approved by Congress if the statute to which they apply are reenacted by Congress unchanged. When this occurs, those interpretations have the force of law and can only be changed by Congress. *See United States v. Correll,* 389 U.S. 299, 305–06, 88 S.Ct. 445, 448–49, 19 L.Ed.2d 537 (1967); *Helvering v. R.J. Reynolds Tobacco Co.,* 306 U.S. 110, 116, 59 S.Ct. 423, 426, 83 L.Ed.536 (1939).

The Wards argue that the earlier interpretations of Treas.Reg. § 1.612–3(b)(3), on which they relied were long standing, and unchanged by any act of Congress. Thus, we are told these interpretations cannot be modified by the IRS.

■ The only interpretations that would support the Wards' tax deduction were Rev.Rul. 70–20 issued in 1970 and Rev.Rul. 74–214 issued in 1974 (providing that lump sum royalties were deductible when paid or accrued). *Redhouse,* 728 F.2d at 1251–52; *Wing,* 81 T.C. at 23–24. These rulings were issued by the IRS regarding I.R.C. § 612.

For the legislative reenactment doctrine to apply, Congress would have to have reenacted I.R.C. § 612 subsequent to 1970. Congress has not reenacted section 612 since the 1970 and 1974 revenue rulings were promulgated. Thus, the doctrine of legislative reenactment does not apply to the 1977 amendment. *Redhouse,* 728 F.2d at 1252.

### e. COMPLIANCE WITH IRS STATEMENT OF PROCEDURAL RULES, 26 C.F.R. § 601.601(d)

■ The Wards contend that the failure of the IRS to comply with IRS Statement of Procedural Rules, 26 C.F.R. § 601.601(d) in promulgating the 1977 amendment of section 1.612–3(b)(3) invalidates the amendment.

We hold that the IRS had no duty to comply with section 601.601(d), because that regulation does not have the force and effect of law. In *Rank v. Nimmo,* 677 F.2d 692 (9th Cir.), *cert. denied,* 459 U.S. 907, 103 S.Ct. 210, 74 L.Ed.2d 168 (1982), we established a two part test for determining whether a published rule has the force and effect of law. *Id.* at 698. A published rule has such effect if the rule (1) "prescribe[s] substantive rules—*not* inter-

pretive rules, general statements of policy or rules of agency organization, procedure or practice," *id.* (emphasis in original); and (2) "the agency promulgate[d] the rules pursuant to a specific statutory grant of authority and in conformance with the procedural requirements imposed by Congress." *Id.*

Section 601.601(d) fails to meet the first prong of the test. The rule must be "legislative.in nature, affecting individual rights and obligations." *Id.* at 698. As *Rank* explicitly notes, statements of policy are not substantive rules. *Rank,* 677 F.2d at 698. Section 601.601(d), by its own language, is a policy statement.

We have not specifically addressed the question whether publication in the Code of Federal Regulations gives section 601.601 the force and effect of law. However, the issue has been well settled in other circuits with regard to analogous sections of the IRS Statement of Procedural Rules. *Einhorn v. DeWitt,* 618 F.2d 347 (5th Cir. 1980); *Luhring v. Glotzbach,* 304 F.2d 560 (4th Cir.1962).

In *Einhorn,* a taxpayer contended that section 601.107(b)(2) imposed a duty on the IRS to disclose information at a preindictment conference. The court held that the only mandatory aspect of the rule was that a taxpayer had a right to a conference. The rule imposed no duty to disclose information. *Einhorn,* 618 F.2d at 348–49. The court held that section 601.107(b)(2) "is a part of the Internal Revenue Service's Statement of Procedural Rules ... [and as such] their purpose is to govern the internal affairs of the Internal Revenue Service. They do not have the force and effect of law." *Einhorn,* 618 F.2d at 349–50. The court held that the IRS did not have to disclose information in spite of the explicit language of the rule stating that the IRS "will" inform the taxpayer. 26 C.F.R. § 601.107(b)(2). Because section 601.601(d) is by its terms a statement of policy, it would not have the force and effect of law under the rationale in *Einhorn.*

In *Luhring,* a taxpayer contended that a failure to comply with section 601.105 in-

validated an assessment the IRS made against him. The court held that section 601.105 did not have the force and effect of law, and thus noncompliance with it could not invalidate the IRS action. *Luhring,* 304 F.2d at 563. The court found it apparent that section 601.105 was a rule designed "to govern the conduct of the agents of the Internal Revenue Service.... *Id.* at 564. Because this rule was directory in nature, it did not have force and effect of law. *Id.*

Section 601.105 is part of the IRS Statement of Procedural Rules as is section 601.-601(d). Because section 601.601(d) is explicitly directed at controlling the conduct of the IRS, it does not have the force and effect of law. Accordingly, noncompliance with section 601.601(d) does not invalidate Treas.Reg. § 1.612–3(b)(3).

## CONCLUSION

Based on the foregoing analysis, we conclude that Treas.Reg. § 1.612–3(b)(3) is valid and that the Wards' minimum royalty payment is not deductible.

AFFIRMED.