DAVID E. WASSERSTROM and SANDRA R. WASSERSTROM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wasserstrom v. Commissioner
Docket No. 15943-81.
United States Tax Court
T.C. Memo 1986-417; 1986 Tax Ct. Memo LEXIS 191; 52 T.C.M. (CCH) 392; T.C.M. (RIA) 86417; September 4, 1986. *191 P, a tax attorney, deducted his distributive share of 1977 losses of two partnerships both formed for the purpose of mining coal on leased property. The partnership losses resulted from claimed deductions for advanced royalty payments to third parties. The advanced royalties were paid in part by cash and in part by partnership notes. Payment of the partnership notes depended upon the partnership's "available cash." No coal was ever mined by or on behalf of either partnership. As a result of an office audit involving substantiation of medical and charitable deductions, P signed a Form 1902-E (Report of Individual Audit Change) and paid a $42 tax deficiency for 1977. Subsequently, respondent disallowed deductions claimed by P with respect to his distributive share of 1977 partnership losses. Held: (1) Form 1902-E is not a final closing agreement within the meaning of section 7121, I.R.C. 1954; (2) the partnerships were structured to generate substantial tax benefits and neither was formed with an objective of entering into coal mining activities for profit; thus P's claimed 1977 deductions for his distributive share of partnership losses are disallowed; Section 1.612-3(b)(3), Income Tax Regs., *192 valid., and (3) Respondent's imposition of addition to tax for negligence sustained. Joseph E. Lundy and Gerhart L. Klein, for the petitioners. David E. Gaston and Kenneth J. Rubin, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: By notice of deficiency dated April 6, 1981, respondent determined a deficiency in petitioners' 1977 Federal income tax in the amount of $250,487, and an addition to the tax pursuant to section 6653(a) [1] in the amount of $12,524. Petitioners attack the validity of the notice of deficiency, contending that respondent is barred from assessing additional tax liabilities because petitioner David E. Wasserstrom signed a Form 1902-E (Report of Individual Income Tax Audit Changes) with respect to 1977 on February 2, 1979. Thus, before deciding the substantive issues, we must decide whether Form 1902-E is a final closing agreement within the meaning of section 7121. In the event we determine that Form 1902-E is not a final closing agreement, *193 then both parties have made certain concessions. After concessions, the remaining substantive issues are: (1) whether petitioners are entitled to deduct their distributive share of losses from the coal mining activities of two limited partnerships, Campbell Hollow Associates, II, Ltd. and North Fork Associates; and (2) whether petitioners are liable for an addition to tax pursuant to section 6653(a). [2]
FINDINGS OF FACT Some of the facts have been stipulated; the stipulation of facts and attached exhibits are incorporated herein by this reference. David E. Wasserstrom and Sandra R. Wasserstrom, husband and wife, resided in Melrose Park, Pennsylvania at the time they filed their petition. Sandra Wasserstrom is a party in this case solely because she filed a joint return with her husband for 1977; therefore David Wasserstrom will be referred to as petitioner. Petitioner is an attorney concentrating in taxation and business related matters. He received a Masters of Law Degree in taxation and was a law clerk for one of the judges on this Court from 1963 to 1964. He *194 has prepared numerous private offering memoranda for partnerships engaged in coal tax shelters, [3] including the private offering memoranda for the two limited partnerships involved herein.
Campbell Hollow Associates II, Ltd.
Campbell Hollow Associates II, Ltd. (CHA) is a Florida limited partnership formed on December 28, 1977, for the purpose of mining coal on leased land located in Whitley County, Kentucky. The sole general partner was Richard D. Kaplan. [4]
During 1977, petitioner and Morris L. Chucas were equal partners in Elliott H. Lewis Associates ("Lewis Associates"). [5] *195 On December 28, 1977, Lewis Associates contributed $150,000 to CHA [6] and became a 25.62 percent limited partner therein; accordingly, petitioner had a 12.81 percent indirect interest in CHA. On December 30, 1977, CHA obtained from Williamsburg Associates (Williamsburg), a Florida general partnership, the right to mine and remove all mineable and merchantable coal from three tracts of land in Whitley County, Kentucky (the Campbell Hollow site) pursuant to a lease for a basic term of 20 years. [7] Under the lease, CHA agreed to pay Williamsburg a royalty of $2.50 per ton for all coal mined and sold and a minimum annual royalty of $153,866 during the term of the lease. The minimum annual royalty for the first 15 years (i.e., $2,308,000) [8] was payable in advance as follows: $496,800 in cash and a note for the $1,811,200 balance. The note bore interest at the rate of six percent per annum and was to mature on December 31, 1992. Payment of the note was dependent upon CHA's "available cash", i.e., cash remaining after CHA paid "all normal and ordinary" expenses other than payment on the note and distributions to its partners. The note was described as "fully *196 recourse" as to both CHA and all its partners except that it became nonrecourse (secured only by the assets of CHA) if: (1) CHA's average tonnage of coal mined and sold for any consecutive three year period was less than 55,000 tons; or (2) the principal balance of the note was reduced to $1 million by December 31, 1987. On December 30, 1977, CHA entered into (1) a mining contract with Medlin Coal Company [9] under which Medlin would operate a coal mine on the Campbell Hollow site and receive $16 per ton for all coal mined *197 and sold, and (2) a sales agreement with London Brokerage Company to sell the coal mined at the Campbell Hollow site at a fixed price of $20.75 per ton until 1983, and $20.88 thereafter. The Campbell Hollow site had never previously been mined; no core samples to indicate the existence (and amount) of coal on the site were taken, and no mining permits were obtained. No coal was mined on the Campbell Hollow site by Medlin or by CHA, and CHA made no payments on its note to Williamburg. The $577,000 CHA received as capital contributions was used as follows: Payee
Amount
Purpose
Williamsburg
$496,800
advanced minimum
royalty
David E. Wasserstrom
32,000
legal fees
Richard Kaplan
40,000
management fee
$568,800
8,200
working capital
TOTAL
$577,000
In its 1977 return, CHA reported a loss of $2,377,955, including the advanced royalty payment of $2,308,000; petitioner through his interest in Lewis Associates, deducted $304,616 as his distributive share of the partnership's 1977 loss, which deduction respondent disallowed. North Fork Associates
Petitioner contributed, as a limited partner, $11,250 to the capital *198 of North Fork Associates (North Fork), a New Jersey limited partnership formed on December 27, 1977, for the purpose of mining coal on subleased land located in Perry County, Kentucky. [10]North Fork's sole general partner was Barry Wasserstrom. [11]
On December 29, 1977, North Fork obtained from Partridge Coal Company, a Kentucky corporation (Partridge), the right to mine and remove all mineable and merchantable coal from two tracts of land located in Perry County, Kentucky (the Boggs property), pursuant to a sublease for a basic term of 20 years. Under the sublease, North Fork agreed to pay Partridge a royalty equal to 12.5 percent of the gross selling price of all coal mined and sold and a minimum annual royalty of $125,000 during the term of the sublease. The minimum annual royalty for the first 14 years (i.e., $1,750,000 [12] *200 ) was payable in advance as follows: $500,000 in cash and a note *199 for the $1,250,000 balance. The note bore interest at the rate of six percent per annum and was to mature on December 31, 1989. Payment was dependent on North Fork's "available cash", i.e., cash remaining after North Fork paid "all normal and ordinary" expenses other than payment on the note and distribution to its partners. The note was described as "fully recourse" as to both North Fork and all its partners except that it became nonrecourse (secured only by the assets of North Fork) if: (1) North Fork's average tonnage of coal mined and sold for any consecutive three year period was less than 30,000 tons; or (2) the principal balance of the note was reduced to $750,000 by December 31, 1983. On December 29, 1977, North Fork entered into a contract with Partridge Mining Company, a Kentucky corporation, (Partridge Mining) [13] to mine coal on the Boggs property at a price of 75 percent of the gross selling price (excluding commissions) of all coal mined and sold. No coal was mined by Partridge Mining or North Fork on the Boggs property, and North Fork made no payments on its note to Partridge. The $526,000 NFA received as capital contributions was used as follows: Payee
Amount
Purpose
Partridge
$500,000
advanced minimum royalty
David E. Wasserstrom
17,500
legal fees
Barry Wasserstrom
6,000
management fee
$523,500
2,500
working capital
TOTAL
$526,000
In its 1977 return, North Fork reported a loss of $1,773,500, including the advanced royalty payment of $1,750,000; petitioner deducted $37,244 as his distributive share of the partnership's 1977 loss, which deduction respondent disallowed. Procedural Issue
As a result of an office audit involving substantiation *201 of medical and charitable deductions claimed in 1977, petitioner agreed to certain adjustments resulting in a $42 tax increase. At the time of the audit (February 2, 1979), petitioner signed respondent's Form 1902-E, entitled "Report of Individual Tax Audit Changes." The form contained the following language: Although this report is subject to review, you may consider it as your written notice that your case is closed if you are not notified of an exception to these findings within 30 days after a signed copy of this report or a signed waiver, Form 870, is received by the District Director. If you agree, please sign one copy and return it in the enclosed return envelope. Keep the other copy with your records. Petitioner's wife, who was not present at the meeting with respondent's agent, did not sign the form, nor did the auditing agent. Several months thereafter, petitioner received a bill from the Internal Revenue Service for $42, plus interest, which he promptly paid. Subsequently, respondent questioned the deductions claimed by petitioner with respect to his share of losses from various partnerships, including CHA and North Fork. In November, 1980, respondent sent petitioner *202 a Form 872, entitled "Consent to Extend the Time to Assess Tax," and requested petitioner to agree to an extension of the period of limitations on assessment for 1977. Petitioner did not sign the Form 872; respondent therefore issued, on April 6, 1981, the notice of deficiency involved herein. Respondent contends that petitioner is not entitled to deduct any amount as his distributive share of CHA's or North Fork's losses because neither partnership engaged in coal mining activities for profit. Even if the partnerships had bona fide profit motives, respondent claims that: (a) pursuant to section 1.612-3(b)(3), Income Tax Regs., deductions are not allowable with respect to the advanced minimum royalty payments, and (b) the notes for those royalty payments were not bona fide obligations. Petitioner argues that respondent was precluded from determining a deficiency for 1977 by application of the terms contained in Form 1902-E. [14] Even if the notice of deficiency was validly issued, claims petitioner, he is entitled to deduct his share of partnership losses because the partnerships engaged in coal mining activities for profit. Section 1.612-3(b)(3), Income Tax Regs., according to petitioner, *203 was invalidly amended; under the regulation prior to amendment, the partnerships' advanced minimum royalties were deductible. Finally, claims petitioner, the partnership notes were bona fide. OPINION Procedural Issue
Section 7121 authorizes the Secretary or his delegate to enter into a written agreement relating to a taxpayer's liability for any internal revenue tax for any taxable period. Such an agreement is a final and conclusive determination of the taxpayer's liability with respect to all matters covered by the agreement. The exclusive method of finally closing a taxable year by agreement is to meet all of the statutory requirements of section 7121. Botany Worsted Mills v. United States,278 U.S. 282 (1929). Section 7121 envisages an agreement knowingly entered into by both the taxpayer and respondent. Estate of Meyer v. Commissioner,58 T.C. 69, 71 (1972). *204 Section 301.7121-1(d)(1), Proced. & Admin. Regs., provides that all closing agreements shall be executed on forms prescribed by the Internal Revenue Service. The prescribed forms are Form 866, "Agreement as to Final Determination of Tax Liability," and Form 906, "Closing Agreement on Final Determination Covering Specific Matters." Statement of Procedural Rules, 26 C.F.R. Part 601, section 601.202(b). An agreement executed in any other manner is ineffective as a section 7121 closing agreement. Dorl v. Commissioner,507 F.2d 406 (2d Cir. 1974), affg. a Memorandum Opinion on this Court; Knapp-Monarch Co. v. Commissioner,139 F.2d 863 (8th Cir. 1944). Form 1902-E is a form used by respondent's office auditors. It is in essence the same as Form 4549 which is used by respondent's field revenue agents. We have held that Form 4549 is not a final closing agreement within the purview of section 7121. See Hudock v. Commissioner,65 T.C. 351 (1975); Harrington v. Commissioner,48 T.C. 939 (1967), affd. on another issue 404 F.2d 237 (5th Cir. 1968). [15] We hold here that Form 1902-E is not a final closing agreement. Form 1902-E is a written *205 report, informing the taxpayer of the office auditor's proposed adjustments. By signing the report, the taxpayer agrees to the adjustments contained therein and consents to an immediate assessment and collection of tax resulting from such adjustments. Form 1902-E does not contain language binding either party to the adjustments in the report, as would a final closing agreement. A taxpayer thus would not be barred (after signing Form 1902-E) from bringing an otherwise valid suit for refund for the same year to which the Form 1902-E relates. The Form 1902-E signed by petitioner was neither signed by the office auditor, nor by petitioner's spouse with whom he filed a joint return. We do not believe that petitioner, in view of his knowledge and sophistication, truly believed that an office auditor had the authority to close out petitioner's 1977 tax case with absolute finality or that the Form 1902-E which he alone signed rose to the dignity of a final closing agreement within the meaning of section 7121. Deductibility of Losses from Coal Mining Activities
Section 183 provides that if an activity is not engaged in for profit, expenses attributable to the activity are deductible only *206 to the extent of gross income from the activity. [16] Whether an activity is engaged in for profit is determined by applying the rule for deductibility of trade or business expenses under section 162 or the rules for deductibility under section 212(1) or (2). It is well settled that in order to constitute the carrying on of a trade or business, the activity must be engaged in with an "actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Fuchs v. Commissioner,83 T.C. 79 (1984); Dean v. Commissioner,83 T.C. 56 (1984); Allen v. Commissioner,72 T.C. 28 (1979). A profit objective is also necessary in order to deduct expenses under section 212(1) or (2). Lemmen v. Commissioner,77 T.C. 1326 (1981); Jasionowski v. Commissioner,66 T.C. 312 (1976). Although a reasonable expectation of profit is not required, the taxpayer must have the intent and objective of realizing a profit. Hirsch v. Commissioner,315 F.2d 731 (9th Cir. 1963), affg. a Memorandum Opinion of *207 this Court; Brannen v. Commissioner,78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984). "Profit" in this context means economic profit, independent of tax savings. Beck v. Commissioner,85 T.C. 557 (1985); Herrick v. Commissioner,85 T.C. 237 (1985); Surloff v. Commissioner,81 T.C. 210 (1983). The issue of whether a taxpayer possesses the requisite profit motive is one of fact to be resolved on the basis of all the evidence in the case. Sutton v. Commissioner,84 T.C. 210 (1985), affd. 788 F.2d 695 (11th Cir. 1986); Fox v. Commissioner,80 T.C. 972 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. without published opinion sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hookv. Commissioner,Kratsa v. Commissioner,Leffel v. Commissioner,Rosenblatt v. Commissioner,Zemel v. Commissioner,734 F.2d 5-7, 9 (3d Cir. 1984); Dunn v. Commissioner,70 T.C. 715 (1978), affd. 615 F.2d 578 (2d Cir. 1980). In making this determination, more weight must be given to the objective facts than to the taxpayer's mere after-the-fact statements of intent. Thomas v. Commissioner,84 T.C. 1244 (1985), affd. *208 792 F.2d 1256 (4th Cir. 1986); Engdahl v. Commissioner,72 T.C. 659 (1979). Petitioner bears the burden of proving that he possessed the required profit objective. Rule 142(a); Dreicer v. Commissioner,78 T.C. 642 (1982); Golanty v. Commissioner,72 T.C. 411 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of some relevant factors to be considered in determining whether an activity is engaged in for profit. They are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) any elements indicating personal pleasure or recreation. No one factor is conclusive in making the determination. Allen v. Commissioner,72 T.C. 28 (1979). *209 Where a partnership activity is involved, it is the intent of the partnership, rather than that of an individual partner, that is relevant for purposes of section 183. Brannen v. Commissioner,78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Hager v. Commissioner,76 T.C. 759 (1981); Surloff v. Commissioner,81 T.C. 210 (1983).Because a limited partner lacks control over partnership activities, his contention that he had a bona fide profit motive is not of great significance. Dean v. Commissioner,83 T.C. 56 (1984). The intent of the general partner or, in the case of a tax shelter, the promoter, is more relevant because these individuals actually control the partnership's activities. Fuchs v. Commissioner,83 T.C. 79 (1984). After thoroughly considering the entire record, we are convinced that both CHA and North Fork were structured primarily, if not solely, to generate substantial tax benefits and that neither partnership was formed with an objective of entering into coal mining activities for profit. Thus, pursuant to section 183, the expenses incurred by the partnerships in connection with their coal mining activities are deductible only to the extent of income therefrom. *210 As there was no income realized by either CHA or North Fork in 1977, the claimed deductions for petitioner's distributive share of the partnership losses were properly disallowed entirely. Richard Kaplan, CHA's general partner, had no prior coal mining experience; Barry Wasserstrom, North Fork's general partner, had minimal prior experience. Neither partnership obtained mining permits and neither mined coal on their respective property sites. The mining royalties appear excessively high as do the management fees to the general partners, whereas the working capital for each partnership was extremely low. In order to generate profits, each partnership would have had to mine substantially all of the estimated recoverable coal, and petitioner's estimation of the amount of recoverable coal appears exaggerated. Even if the partnerships had entered into their mining activities for profit, the advanced royalty payments still would not be deductible. Section 1.612-3(b)(3), Income Tax Regs., as amended in December, 1977, retroactively to October 29, 1976, provides: (3) The payor shall treat the advanced royalties paid or accrued in connection with mineral property as deductions from gross *211 income for the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold. For purposes of the preceding sentence, in the case of mineral sold before production the mineral product is considered to be sold when the mineral is product (i.e., when a mineral product first exists). However, in the case of advanced mineral royalties paid or accrued in connection with mineral property as a result of a minimum royalty provision, the payor, at his option, may instead treat the advanced royalties as deductions from gross income for the year in which the advanced royalties are paid or accrued. See section 446 (relating to general rule for methods of accounting) and the regulations thereunder. For purposes of this paragraph, a minimum royalty provision requires that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount. For purposes of the preceding sentence, in the case of a lease which is subject to renewal or extension, the period for which it can be renewed or extended *212 shall be treated as part of the term of the original lease. * * * [Emphasis added.] On several occasions we have analyzed transactions that are not materially distinguishable from those involved herein. In each of those occasions, we denied a deduction for advanced royalty payments, which were evidenced by a promissory note payable or recoupable out of mining receipts. Vastola v. Commissioner,84 T.C. 969 (1985); Maddrix v. Commissioner,83 T.C. 613 (1984), affd. 780 F.2d 946 (11th Cir. 1986); Wing v. Commissioner,81 T.C. 17 (1983). The validity of regulation section 1.612-3(b)(3), as amended, has been upheld by the Court, as well as by two Courts of Appeal. Oneal v. Commissioner,84 T.C. 1235 (1985); Wing v. Commissioner,81 T.C. 17 (1983); Wendland v. Commissioner,79 T.C. 355 (1982), affd. per curiam 739 F.2d 580 (11th Cir. 1984), affd. sub nom. Redhouse v. Commissioner,728 F.2d 1249 (9th Cir. 1984). Negligence Penalty
The final issue for decision is whether petitioner is liable for additions to the tax pursuant to section 6653(a). Section 6653(a) applies where the underpayment is due to negligence or intentional disregard of the rules and regulations. Petitioner bears the *213 burden that the determination of the negligence addition is erroneous. Rule 142. Petitioner has failed to persuade us that respondent's imposition of such addition was unwarranted. Based on his knowledge of the tax law, petitioner knew, or should have known, that the claimed deductions for pertnership losses were not allowable. Accordingly, we sustain respondent's determination with respect to the addition to tax pursuant to section 6653(a). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Resolution of the substantive issues impacts the amount of petitioners' deductions for medical expenses and sales taxes.↩
3. See Weinstein v. Commissioner,T.C. Memo 1986-376↩.
4. Kaplan had no prior coal mining experience.↩
5. Petitioner and Morris L. Chucas were former law partners. They formed Elliot H. Lewis, a general partnership, in 1976 for the purpose of making investments outside their law practice. The name "Elliott H. Lewis" is derived by a combination of the respective middle names of David Elliott Wasserstrom (petitioner) and Morris Lewis Chucas. 6. Pursuant to a private offering of limited partnership interests, CHA raised $576,000; Richard Kaplan, as general partner, contributed an additional $1,000, making the total capital contribution to CHA $577,000.↩
7. Two days prior to entering into the lease (i.e., December 28, 1977) Williamsburg Associates had purchased the Campbell Hollow site for $200,000. ↩
8. The tonnage royalties otherwise due ($2.50 per ton) were to be credited against the annual minimum royalty ($153,866). To generate $153,866 in royalties, 61,546 tons of coal would have to be mined each year from the Campbell Hollow site, and over the term of the lease (25 years) 1,538,650 tons would have to be mined in order to recoup the advanced minimum royalty ($2,308,004). The total amount of recoverable coal from the Campbell Hollow site was estimated by CHA's mining engineer (Mr. Yeloushan) to be 1,620,000 tons.↩
9. The principals of Medlin Coal Company were the same individuals as the principals of Williamsburg.↩
10. Pursuant to a private offering of limited partnership interests, North Fork raised $525,000. ↩
11. Barry Wasserstrom, petitioner's cousin, had minimal prior coal mining experience. He contributed $1,000 to North Fork, making $526,000 the total capital contribution to North Fork. See footnote 10.↩
12. The percentage royalties otherwise due (12.5 percent of the gross selling price of all coal mined and sold) were to be credited against the annual minimum royalty ($125,000). To generate $125,000 in royalties, 40,000 tons of coal would have to be mined from the Bogg property and sold for $25 per ton (the spot market price of coal in December, 1977) each year, and over the term of the lease (20 years) 800,000 tons of coal would have to be mined in order to recoup the advanced minimum royalty ($1,750,000). The total amount of recoverable coal from the Bogg property was estimated by North Fork's mining engineer (Mr. Ham) to be 1,044,500 tons.
13. Robert D. Powell was the president and a stockholder of both Partridge and Partridge Mining.↩
14. Shortly before trial, petitioners filed a motion for leave to file an amended petition, raising theories of equitable estoppel and violation of the requirements of section 7605. That motion was denied; neverthless, petitioners argued those theories on brief. We shall not consider issues not timely raised. See Rule 34(a).↩
15. See also Person v. Commissioner,T.C. Memo 1985-211↩.
16. Certain deductions which are allowable without reference to gross income from the activity (e.g., interest and taxes) are not in issue.↩