David SOHAPPY, Sr., Myra Sohappy, David Sohappy, Jr., Henry Alexander, David Winnier, Michael Brisbois, Michael Hunt, Johnny Kuneki Queampts, Johnny Jackson and The Chiefs and Council of the Columbia River Indians, Plaintiffs–Appellants,

v.

Donald P. HODEL, Secretary of Interior; Ross Swimmer, Assistant Secretary for Indian Affairs; Stanley Speaks, Area Director for Bureau of Indian Affairs; Casper Weinberger, Secretary of Defense; John Marsh, Jr., Secretary of the Army; Lt. Gen. Joseph Bratton, Chief of the Corps of Engineers; Col. Gary Lord, District Engineer for Oregon, all in their official capacities, and their successors in interest, and the United States of America, Defendants–Appellees.

No. 88–3531.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 1, 1989.

Decided Aug. 3, 1990.

Gary M. Berne, Stoll, Stoll, Berne, Fischer & Lokting, P.C., Portland, Or., Jack L. Schwartz, Portland, Me., for plaintiffs-appellants.

Angus E. Crane, Dept. of Justice, Land and Natural Resources Division, Washington, D.C., for defendants-appellees.

Before TANG, BOOCHEVER and KOZINSKI, Circuit Judges.

BOOCHEVER, Circuit Judge:

Lewis and Clark encountered the following scene at an Indian fishing village in 1805:

From time immemorial the junction of the Snake and Columbia rivers had been a favorite gathering place for Indians from throughout the Columbian Plain.... [T]he river teemed each summer with salmon coming in repeated hordes to the forks....

When the Corps of Discovery reached the confluence, the last of that year's migration was ending.... The Indians, too, were leaving.... But, like the living salmon, many still remained, the men busy with spears, nets, and weirs, while the women dexterously slit in half and disemboweled, one by one, the fish brought to them and then laid the pieces on wooden scaffolds to dry. Amazed by the number of the structures, Clark tried to find out how far the people had rafted the timbers used in their building.... Meanwhile both captains took note of the unusual houses. They were simple rectangles, fifteen to sixty feet long. Forked timbers supported the ridgepoles; the roof slopes and walls were covered with large mats made of rushes.... Several families, each with its own fireplace, occupied each house.

D. Lavender, *The Way to the Western Sea* 280–81 (1988). This case requires us to determine whether, in the Treaties of 1855, the Indians ceded their right to maintain structures of the same general type. Now, more than a century after the treaty was negotiated, the government contends for the first time that they may only maintain camping facilities and must remove them when not actively engaged in fishing and fish processing.

The plaintiffs are individual members of the Yakima or Umatilla Indian Tribes and the Chiefs and Council of the Columbia River Indians. They appeal from the district court's entry of summary judgment and an injunction against them and in favor of the government. The district court held that a regulation of the Department of Interior authorizing the Bureau of Indian Affairs (BIA) to evict the plaintiffs from Indian fishing sites on federally owned land was valid, and entered an injunction requiring the plaintiffs when not engaged in fishing to remove their dwellings from the land. The court dismissed for lack of jurisdiction the plaintiffs' claim for replacement of fishing lands and buildings flooded by the Bonneville Dam Pool.

## FACTS

In 1855, pursuant to a government policy to extinguish Indian title to land in the Pacific Northwest, Isaac Stevens, the Governor of the Washington Territory and Superintendent of Indian Affairs in the Territory, negotiated treaties with the various Indian tribes in the area. *See Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 661–62, 99 S.Ct. 3055, 3062–63, 61 L.Ed.2d 823 (1979); *United States v. Washington*, 520 F.2d 676, 682 (9th Cir.1975), *cert. denied*, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976); *Settler v. Lameer*, 507 F.2d 231, 235 (9th Cir.1974); Appropriation Act of March 3, 1853, 10 Stat. 226, 238.

Each treaty concluded as a result of these negotiations contains similar language. The government agreed to set apart certain land as an Indian reservation, pay money, and provide education, medical care, agricultural supplies and tools for the Indians. The Indians agreed to "cede to the United States all their right, title, and claim to all and every part of the country claimed by them" and to "remove to and settle upon the [reservation] within one year after the ratification of [the] treaty" provided "[t]hat the exclusive right of taking fish in the streams running through and bordering said reservation is hereby secured to said Indians; and at all other

usual and accustomed stations, in common with the citizens of the United States, and of erecting [suitable houses or temporary buildings] for curing the same...." Treaty With Indians in Middle Oregon, June 25, 1855, 12 Stat. 963–64 (1859); Treaty With the Yakima, 1855, 12 Stat. 951 (1859). Some treaties used the words "suitable houses" or "suitable buildings" while others used the words "temporary houses" or "temporary buildings." *See* 12 Stat. 927–980.

The plaintiffs have produced evidence, which will be discussed in detail below, that the Indians continued to maintain the customary structures year-round at these sites until the 1930s. In the 1930s the pool resulting from the construction of the Bonneville Dam submerged many of the Indians' usual and accustomed fishing stations. The plaintiffs have produced evidence that the pool also flooded wooden houses, removable dwellings, drying sheds, and fishing platforms, and that the Corps of Engineers told the Indians that the government would replace the land and buildings. The replacement land was to consist of approximately 400 acres.

In 1945 Congress appropriated $50,000 for the acquisition of land in Oregon and Washington to replace these fishing grounds. The land acquired was to be transferred to the Secretary of the Interior for the use and benefit of the Indians, and was to be "subject to the same conditions, safeguards, and protections as the treaty fishing grounds submerged or destroyed." Act of March 2, 1945, ch. 19, 59 Stat. 10, 22 (1945 Act). The amount available for the acquisition was later increased to $185,000. Act of June 8, 1955, 69 Stat. 85. Slightly more than 40 acres were acquired. These sites are known as the "in-lieu" sites.

The Indian plaintiffs in this case occupy these sites year-round. Some live in houses or trailers which remain year-round, while others use the sites for year-round storage of trailers and other personal property. There is evidence that the Indians fish year-round. The Department of Interior issued a regulation effective April 9, 1967 requiring prior approval for placing or maintaining structures on the sites. The regulation also provided:

> No permit may be issued for any permanent or semi-permanent structure used for dwelling purposes or for parking any house trailer to be occupied on any such site as a dwelling if such structure or trailer installation does not conform to the health, sanitation, and safety requirements of State or local law.

25 C.F.R. § 255.6 (1968). The regulation clearly implied that year-round dwellings were contemplated. In 1969, however, the Department of Interior promulgated a regulation prohibiting many of the structures then existing. The current version of the regulation provides:

> Sec. 248.6 Structures.
>
> No dwellings or structures shall be erected, placed, or maintained upon the sites, except that camping facilities may be placed thereon only as herein described and fish drying facilities and fishing platforms may be erected by Indians for use during the fishing season. Facilities for camping on the sites shall be limited to tents, tepees, campers, and mobile trailers. All such tents, tepees, campers, and mobile trailers shall be removed from the sites at any time the owners thereof are not actively engaged in fishing, drying fish, or processing fish by other means.

25 C.F.R. § 248.6 (1987). No evictions were threatened until 1984 when the BIA served eviction notices on several of the plaintiffs.

On November 1, 1988, after this case was briefed, Congress appropriated $2,000,000 for the acquisition and improvement of up to 360 acres of additional land adjacent to the Bonneville Pool to provide fishing access and facilities for the Indians. Act of Nov. 1, 1988, Pub.L. No. 100–581, § 401, 102 Stat. 2938, 2944 (1988).

## PROCEDURAL HISTORY

The plaintiffs filed an administrative appeal, arguing that the evictions were based on a misinterpretation of the regulation and that the regulation was invalid. The Interior Board of Indian Appeals (IBIA) determined that the BIA had correctly in-

terpreted the regulation and that the IBIA did not have authority to determine the validity of the regulation.

The plaintiffs then filed this suit in the district court. They sought review of the IBIA's decision that it lacked the authority to determine the validity of the regulation, requesting a remand to the IBIA. They also sought review of the agency's eviction action and a declaration that the regulation is invalid because it contradicts the 1855 treaties, the subsequent agreements between the Indians and the Corps of Engineers, and the 1945 Act. In addition, the plaintiffs sought either damages for the value of the land and buildings which the government agreed to acquire to replace the lands submerged by the Bonneville Dam, or an order requiring the government to replace them.

The government counterclaimed, seeking to enjoin the plaintiffs from unlawfully occupying the sites and to require them to remove their dwellings, trailers and other structures. The government then filed a motion for summary judgment.

The district court, adopting the recommendation of a magistrate, held that the court should determine the validity of the regulation rather than remand to the IBIA, and that the regulation was valid and enforceable. It granted the government's motion for summary judgment against the plaintiffs on their claims and in favor of the government on its counterclaim, and entered an injunction requiring the plaintiffs to remove all structures except those permitted by the regulation. The court found it did not have jurisdiction to determine the plaintiffs' claims for affirmative relief.

## DISCUSSION

I. The Jurisdiction of the IBIA to Determine the Validity of the Regulation

■ We affirm the part of the district court's order ruling that there was no need to remand to the IBIA because the court could determine the validity of the regulation. The regulations establishing the authority of the IBIA are silent on the issue

of whether the IBIA may rule on the validity of a duly promulgated regulation. The IBIA, however, has consistently taken the position that it cannot. *See Jones v. Acting Sacramento Area Director*, 13 IBIA 124, 125 (1985); *Zarr v. Acting Deputy Director, Office of Indian Education Programs*, 11 IBIA 174, 177 (1983). We agree that the IBIA was authorized to determine that its jurisdiction did not extend to ruling on the validity of the regulation. *See* 3 K. Davis, *Administrative Law Treatise*, § 14.19 (1980).

II. Standard of Review

We review the district court's grant of summary judgment de novo to determine whether there is a genuine issue of material fact. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 629–30 (9th Cir.1987). A fact is material if it is "relevant to an element of a claim or defense" and if its "existence might affect the outcome of the suit." *Id.* at 630. A genuine issue of fact exists if a rational trier of fact might resolve the issue in favor of the party opposing the summary judgment. *Id.* at 631.

The legality of the evictions in this case depends on the validity of the regulation prohibiting the placement or maintenance of any dwellings or structures except for certain prescribed types of temporary camping facilities, fish drying facilities and fishing platforms for use during the fishing season, 25 C.F.R. § 248.6 (1987). The validity of the regulation depends on whether it is consistent with the treaties of 1855 and the 1945 Act by which the in-lieu sites were acquired. That Act provided that the land would be "subject to the same conditions, safeguards, and protections as the treaty fishing grounds submerged or destroyed." 59 Stat. at 22. If the treaties or the 1945 Act reserved the Indians' right to maintain the structures prohibited by the regulation, then the regulation conflicts with the statute and is invalid.

We review the BIA regulation implementing the treaties and the 1945 Act under the Administrative Procedure Act. *United States v. Eberhardt*, 789 F.2d 1354,

1362 (9th Cir.1986). "The reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right...." 5 U.S.C. § 706(2)(A), (C) (1988). When reviewing an agency's construction of a statute or treaty it administers, we first must determine "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 843 n. 9, 104 S.Ct. at 2782 n. 9; *accord Dole v. United Steelworkers of America,* — U.S. ——, 110 S.Ct. 929, 938, 108 L.Ed.2d 23 (1990). It is only in the absence of clear congressional intent that we review the agency's interpretation to determine if that interpretation "is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782; *See United Steelworkers,* 110 S.Ct. at 938.

III. The Validity of the Regulation

■ We first must determine whether in enacting the 1945 Act, Congress expressed a clear intent to allow year-round dwellings on the in-lieu sites. Employing traditional tools of statutory construction to ascertain the intent of Congress, we look first to the language of that Act. *United Steelworkers,* 110 S.Ct. at 934. The 1945 Act provides that the lands and facilities replacing those flooded as a result of the construction of the Bonneville Dam were to be transferred to the Secretary of the Interior for the use and benefit of the Indians "subject to the same conditions, safeguards, and protections as the treaty fishing grounds submerged or destroyed." 59 Stat. at 22. We note initially that Congress did not limit the "conditions, safeguards, and protections" to those afforded by the treaties, but assured preservation of the same conditions as were present on the "fishing grounds submerged or destroyed." We believe the language of the Act expresses the clear intent of Congress that the in-lieu sites were to be subject to the same conditions and rights the Indians enjoyed on their former lands. "Conditions" is defined as "attendant circumstances: existing state of affairs." *Webster's Third New International Dictionary* 473 (1976). Thus we believe Congress clearly intended that the prior existing state of affairs on the submerged lands was to be duplicated on the in-lieu sites.

The undisputed evidence presented in opposition to the motion for summary judgment establishes that one of the conditions under which the submerged lands were used by the Indians was maintenance of year-round structures. It is a truism that a picture is worth a thousand words. The record contains photographs of a fishing station shortly before the creation of the Bonneville Dam pool. The photographs show wooden houses and drying sheds as well as tepees and other camping structures. The wooden dwellings obviously are of a type that remained on the land year-round. Before construction of the dam began, the Army Corps of Engineers was advised by the BIA and by the Indians that at least 40 families had houses on the lands that would be flooded. The Corps agreed to rebuild the houses for the Indians if money was available for this purpose. This conduct further demonstrates that the intent of Congress in the 1945 Act, and the contemporary understanding of those who requested and implemented that Act, was that the Indians would be allowed to maintain their customary, year-round dwellings on the in-lieu sites.

Moreover, by allowing year-round dwellings on the original lands and the in-lieu sites until 1969, the BIA impliedly construed the treaties to allow such structures. "It is well established that 'where, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it

affects the new statute.' " *St. Regis Mohawk Tribe, New York v. Brock*, 769 F.2d 37, 50 (2nd Cir.1985) (quoting *Lorillard v. Pons*, 434 U.S. 575, 581, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978)), *cert. denied*, 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986). Similarly, in *Ward v. Commissioner*, 784 F.2d 1424 (9th Cir.1986), we held that "long standing court or agency interpretations of a statute are deemed to have been approved by Congress if the statute to which they apply are reenacted by Congress unchanged. When this occurs, those interpretations have the force of law and can only be changed by Congress." *Id.* at 1430. While the 1945 Act was not a reenactment of a statute, we must presume that Congress had knowledge of the existing state of affairs on the treaty fishing grounds, including the BIA's implied interpretation of the treaties, when Congress approved the acquisition of the in-lieu sites. We believe Congress clearly intended that these conditions were to continue on the in-lieu lands.

▇ Another consideration in ascertaining Congress' intent in enacting the 1945 Act, however, is whether the plain language of the treaties prohibited such year-round use. We would find difficulty in concluding that Congress clearly intended a use plainly prohibited by the treaties.

The district court adopted the magistrate's recommendation that the plain language of the treaties was unambiguous in prohibiting year-round dwellings on the fishing sites. The treaties, however, state that the Indians retained the right to take fish at their "usual and accustomed stations" and to erect "suitable" or "temporary" houses or buildings for curing the fish. The words of the treaties alone, written 130 years ago, do not provide the answer to the question whether year-round structures were allowed to be maintained.

For example, nothing in the words of the treaties indicates that wooden houses are impermissible, or that any structures must be removed whenever the Indians are not actively engaged in fishing. Even the use of the word "temporary" instead of "suitable" in some of the treaties does not eliminate the ambiguity: it may mean used seasonally during active fishing, or it may mean less enduring than stone. What is "temporary" is relative, depending on the context in which the term is used. When Ozymandias, "king of kings," had his mammoth statue constructed, saying "Look on my works, ye Mighty, and despair," he hardly expected that, in time, all that would remain were "Two vast and trunkless legs of stone".[1] On the other hand, we take judicial notice that some of the "temporary housing" constructed by the United States Government during World War II consists of wooden apartments which are still in use today. *See* Act of Oct. 14, 1940, 54 Stat. 1125 (codified as added and amended 42 U.S.C. § 1571, omitted as executed 1953) (providing for the construction of "temporary housing facilities"). And the fact that in some treaties the word "suitable" was used instead of "temporary" only makes the word's intended meaning even less clear.

Moreover, special principles govern the interpretation of Indian treaties.[2]

[W]e will construe a treaty with the Indians as "that unlettered people" under-

---

**1.** Percy Bysshe Shelley, "Ozymandias" (1817), in *Bartlett's Familiar Quotations* 466 (E. Beck 15th ed. 1980).

**2.** Our opinion does not rely on the rule of construction that treaties with the Indians are to be construed liberally in favor of the Indians. The dissent nevertheless expends considerable effort to characterize the suit as an internal dispute among Indians. The dissent's argument that Indians support a construction that would prohibit year-round structures is meritless. Significantly, this suit was brought by the Chiefs and Council of the Columbia River Indians, as well as a number of individual Indians, while not one Indian, tribe, or tribal group has joined the agency position. Although some Indians have opposed alleged exclusive fishing rights of others, this disagreement has nothing to do with maintaining year-round structures. Providing for adequate access to the fishing sites does not necessarily require banning all year-round structures. Similarly, arguing that health concerns justify banning the structures is like throwing the baby out with the bath water. Adequately providing for health is a far cry from ordering that no year-round structures be maintained.

stood it, and "as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection," and counterpoise the inequality "by the superior justice which looks only to the substance of the right without regard to technical rules."

*United States v. Winans,* 198 U.S. 371, 380–81, 25 S.Ct. 662, 668–69, 49 L.Ed. 1089 (1905) (quoting *Choctaw Nation v. United States,* 119 U.S. 1, 28, 7 S.Ct. 75, 91, 30 L.Ed. 306 (1886)); *Jones v. Meehan,* 175 U.S. 1, 11–12, 20 S.Ct. 1, 5–6, 44 L.Ed. 49 (1899). The treaties were a grant of rights *from* the Indians *to* the government, and the "extent of that grant will be construed as understood by the Indians at that time, taking into consideration their lack of literacy and legal sophistication, and the limited nature of the jargon in which negotiations were conducted." *Washington,* 520 F.2d at 684; *accord Meehan,* 175 U.S. at 10–11, 20 S.Ct. at 4–5. Thus, to ascertain the meaning of ambiguous language in Indian treaties, the courts and the BIA "look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Choctaw Nation v. United States,* 318 U.S. 423, 431–32, 63 S.Ct. 672, 677–78, 87 L.Ed. 877 (1943).

In this case the evidence produced by the plaintiffs and undisputed by the government indicates that the parties to the treaties intended to allow the same type of structures at the fishing sites that had existed prior to the treaty. This conclusion is reinforced by the fact that the words "temporary houses" and "suitable buildings" were used interchangeably, apparently a shorthand attempt to describe the Indian fishing structures of the time.

According to an expert affidavit prepared by anthropologist Dr. Eugene Hunn and offered by the plaintiffs in opposition to the motion for summary judgment, the fishing practices of these Indians at the time of the treaties involved spending six to eight months each year at fishing and hunting sites. Temporary drying sheds were often erected below the high water mark for easy access during the summer and fall salmon runs. The Indians also cured fish in the structures in which they lived. Therefore, according to Dr. Hunn, the Indians' "usual and accustomed" fishing activities necessarily involved maintaining "permanent"[3] residences at the sites year-round.

The words of the treaty likely attempted to describe such buildings, and thus are susceptible of an interpretation that would allow the Indians to use the fishing sites for year-round maintenance of modern equivalent structures. In his affidavit, Dr. Hunn explains that the words of the treaty would have lost much of their meaning during translation into the Indian languages. As translated to the Indians, the concept of ceding the land would have meant that henceforth the Indians would no longer have exclusive possession of the land—they would have to share it with white settlers—but not that they would be deprived of possession altogether. Thus, the Indians understood that the right to take fish at the usual and accustomed stations qualified the requirement of removing to and settling on the reservation. The BIA has filed no affidavit indicating a different understanding by the Indians.

Turning to the "practical construction adopted by the parties," we note that after the treaties were signed the Indians continued the same lifestyle. Dr. Hunn stated that "it is clear that many of the families that had traditionally resided [at the fishing sites] continued to do so without interruption throughout the post-treaty period, as some have done to the present day."

---

3. The affidavit used the term "permanent" to describe the structures. Generally "permanent" connotes the opposite of "temporary", *see The Random House College Dictionary* 1352 (rev. ed. 1980), and it is unlikely that the Indians understood that the treaty contemplated permanent structures such as stone, or, now, steel and concrete buildings. It seems more likely that the contemporaneous understanding of the treaty was that the structures similar to those then in use at the fishing sites could be maintained year-round. We construe the affidavit as making this more limited claim. The practice for more than 100 years after the treaty reinforces such an understanding.

The record indicates that prior to the 1969 regulation the government made no attempt to disturb the Indians in their occupancy of the lands. The BIA does not dispute this practical construction of the treaties. In fact, a memorandum prepared by the BIA's Portland office in 1970 makes a similar finding. Thus, not only under the contemporaneous construction of the treaties, but for more than a century the Indians were permitted to maintain their structures on the land.

Faced with this evidence of the Indians' understanding of the treaties and of the treaties' practical construction, we cannot agree with the district court that the plain language of the treaties prohibited year-round dwellings. To the contrary, this evidence tends to show that the parties to the treaties, as well as Congress in the 1945 Act, intended to allow such structures. Because we must follow Congress' clearly expressed intent in the 1945 Act, we do not reach the issues of the permissibility of the BIA's implied interpretation of the treaties, or the extent to which we must defer to such an administrative construction.[4] *See United Steelworkers,* 110 S.Ct. at 938.

■ In light of the evidence and the clear expression of congressional intent that the in-lieu sites were made subject to the same conditions that existed on the flooded lands, we reverse the district court's grant of summary judgment on this issue. A close question is presented whether summary judgement should be entered in favor of the plaintiffs although they filed no such motion. *See* 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 2720 at 29–30 & n. 20 (2d ed. 1983) and cases cited therein. We believe, however, that the government should be afforded an opportunity to present evidence, if any, that maintenance of year-round structures was not one of the conditions that existed prior to the flooding of the treaty grounds. We remand for a determination of the conditions that existed prior to the enactment of the 1945 Act on the treaty fishing grounds submerged or destroyed.[5]

4. The dissent vigorously attacks our efforts to follow the Supreme Court's instruction that "[t]he traditional deference courts pay to agency interpretation is not to be applied to alter the clearly expressed intent of Congress." *Board of Governors of the Federal Reserve System v. Dimension Financial Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 686, 88 L.Ed.2d 691 (1986); *accord United Steelworkers,* 110 S.Ct. at 938; *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82. We note that most of the dissent is not directed to the rationale of the majority opinion, namely that Congress has spoken clearly in the 1945 Act mandating that the in-lieu lands maintain the same conditions that existed on the submerged lands. In the few pages devoted to this issue, the dissent construes "the same conditions ... as the treaty fishing grounds submerged or destroyed" to mean "the same terms as the 1855 treaties." It is true that the word "condition" has several different dictionary meanings. When used in the context of "the same conditions ... as the treaty fishing *grounds,*" however, we find it unlikely that Congress intended to give "conditions" the same meaning as the "terms of the *treaties*" under which the lands were used.

The dissent, as an alternative to our interpretation, would assume that Congress merely inserted "conditions" as surplusage. By using "conditions, safeguards, and protections" to refer to the submerged lands as opposed to the 1855 treaties, however, Congress clearly intended that the in-lieu lands replicate the state of the submerged lands, with all their attendant physical conditions and legal safeguards and protections. We accordingly so hold. By doing so, we also follow the basic rule that "[i]n construing a statute we are obliged to give effect, if possible, to every word Congress used." *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979).

The dissent nevertheless pleads for great deference to an administrative agency, apparently believing that Congressional enactments are to be given short shrift. The remaining portion of the dissent attacks a straw man, concluding that we have failed to give proper deference to an administrative interpretation of the 1855 treaties. We find it unnecessary to consider the deference owed the BIA's decision because Congress has spoken clearly on this issue. We discuss the treaties only for the purpose of ascertaining whether they clearly prohibited year-round structures, a factor to be considered in determining Congressional intent. As the dissent concedes, the treaty provisions are ambiguous. Dissent at 1324–25. Thus, when the 1945 Act was passed, there was no reason why Congress could not have intended that year-round structures be maintained as one of the conditions existing on the lands at that time. We therefore do not address the dissent's one-sided arguments on administrative deference.

5. The dissent concludes that the majority errs by remanding rather than deciding this issue.

## IV. The Plaintiffs' Claim for Replacement Lands

■ The plaintiffs argue that the government has breached a series of agreements in which the government promised to acquire 400 acres of land to replace the flooded fishing sites and replace the buildings which were flooded. They seek either damages or the replacement of land and buildings submerged by the Bonneville Dam. The district court dismissed this claim, holding that it was essentially a claim based on contract, and because the amount in controversy exceeded $10,000, the Tucker Act barred relief in the district court. *See* 28 U.S.C. §§ 1346(a)(2), 1491 (1982).

We need not decide this issue, however, for we find that the plaintiffs' claim for replacement land is moot. After the briefing in this case was completed, legislation was enacted appropriating $2,000,000 for the acquisition of up to 360 acres of additional land "to provide access to usual and accustomed fishing areas and ancillary fishing facilities." Act of Nov. 1, 1988, Pub.L. No. 100–581, § 401, 102 Stat. 2938, 2944 (1988). This would bring the area of land and facilities acquired to replace the fishing lands destroyed by the Bonneville Dam to over 400 acres, satisfying the plaintiffs' demands.

## V. Attorneys' fees

■ The plaintiffs seek attorney's fees on appeal under the Equal Access to Justice Act, 28 U.S.C. § 2412. Because there has been no final judgment in this action, this request is premature. *See Papazian v. Bowen*, 856 F.2d 1455, 1456 (9th Cir. 1988); 28 U.S.C. § 2412(d)(1)(B).

AFFIRMED in part, REVERSED in part, and REMANDED.

KOZINSKI, Circuit Judge, dissenting:

This is *not* a case of first impression; every significant issue presented has previously been resolved by the Supreme Court, this court and our sister circuits. The majority today revisits these issues and resolves them in a manner contrary to well established law. In so doing, it creates a major hazard to navigation on the busy waterways of administrative and Indian law.

First, and most fundamentally, the majority wrongly sets aside a Bureau of Indian Affairs regulation by concluding that Congress "clearly intended" the contrary of what the regulation provides, when, in fact, the statute in question amply supports the regulation. Second, the majority misapplies *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and *United States v. Stuart*, 489 U.S. 353, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989), by engaging in de novo interpretation of ambiguous treaty language to determine the validity of another properly adopted and wholly rational BIA regulation. Third, it overlooks further Supreme Court authority by holding that an agency may forfeit its regulatory powers by deferring action on a particular administrative decision. Fourth, the majority creates both intra-circuit and inter-circuit conflicts by holding that the BIA's regulations are owed no deference because the rights of some Indians are adversely affected. And these are only the most serious errors; the majority opinion creates significant ripples in a number of other important areas of the law. I must therefore respectfully dissent.

### I

A. In holding that the Indians may maintain permanent structures on the in-

---

Dissent at 1356–1357. The dissent cites impressive authority for the truism that interpretation of a statute is a question of law. Once the legal meaning of a statute has been determined, however, factual questions may, as here, remain to be resolved. *See, e.g., Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986) ("The question of how [employees] spent their working time . . . is a question of fact. The question whether their particular activities excluded them from the

overtime benefits of the [statute] is a question of law."). The Indians did not file a motion for summary judgment, although they raised the issue of the 1945 Act in opposing the government's motion for summary judgment. On the record before us it appears that maintenance of year-round structures was a condition of the submerged lands. We nevertheless believe that in the exercise of judicial restraint, it is preferable to permit the government to contest this factual issue.

lieu sites, the majority casts aside a perfectly rational BIA regulation prohibiting such structures. While acknowledging the well-established rule that executive interpretations of statutes and treaties generally are entitled to substantial deference, *see* maj. at 1317 (citing *Dole v. United Steelworkers of America,* —— U.S. ——, 110 S.Ct. 929, 938, 108 L.Ed.2d 23 (1990); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)), the majority concludes that it may nevertheless strike down the BIA's regulation because it is contrary to the "clear intent of Congress" in enacting the 1945 Act to allow permanent structures on the in-lieu sites. Maj. at 1317. This simply is not so.[1]

The 1945 Act provides, in relevant part, that the government shall acquire lands in Oregon and Washington to replace Indian fishing grounds submerged or destroyed as a result of the construction of Bonneville Dam. Act of March 2, 1945, ch. 19, 59 Stat. 10, 22 (1945). The lands shall be managed by the Secretary of the Interior, under which the BIA operates, and "shall be subject to the same conditions, safeguards, and protections as the treaty fishing grounds submerged or destroyed." *Id.* According to the BIA, the purpose of the latter provision was to ensure that Indians using the in-lieu sites would retain the same rights they possessed under the treaties:

> "The in-lieu fishing sites are for the benefit of the Yakima, Umatilla, and Warm Springs Indian Tribes, and such other Columbia River Indians, if any, who had treaty fishing rights at locations inundated or destroyed by Bonneville Dam, *to be used in accordance with treaty rights.*"

25 C.F.R. § 248.2 (emphasis added). Thus, under the BIA's regulations, whether the Indians have the right to maintain permanent residences on the in-lieu sites depends solely on whether they had the right to do so on the treaty fishing grounds.

The majority, however, is of an entirely different view. It believes that the 1945 Act demonstrates Congress's "clear intent" to grant the Indians the right to maintain permanent residences on the in-lieu sites and that the Act directly speaks to this issue. According to the majority, the phrase "subject to the same conditions" as used by the Act refers not to the rights the Indians held under the treaties, but rather to the *physical* conditions that existed at the treaty fishing grounds prior to the construction of Bonneville Dam. In other words, the majority sees the purpose of the 1945 Act as to maintain the status quo; if the Indians were maintaining permanent structures at the treaty fishing grounds, they could do so at the in-lieu sites, regardless of whether the treaties actually permitted such structures.

Were we free to construe the 1945 Act entirely on our own, I would nonetheless disagree with the majority's interpretation. The statute in question speaks not simply of conditions, but requires the BIA to maintain the land subject to the same "conditions, safeguards, and protections" as the submerged land. The terms "safeguards" and "protections" clearly refer to legal concepts, not physical ones. I find it anomalous that in a string of three nouns, Congress would include one that deals with the realm of the physical world and two others, largely redundant, to refer to matters legal. It is far more likely that Congress—reflecting lawyers' time-honored proclivity for using three words where one would suffice—used the phrase "conditions, safeguards, and protections" to refer to a unified concept, namely the legal conditions and restrictions applicable under prior law.

---

1. It is true, of course, that the courts are the final arbiters of questions of law. But the Supreme Court has held time and again that our power to interpret ambiguous statutory provisions is severely limited when there is an administrative determination of the meaning of those provisions. *See, e.g., Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835, 1848–49, 104 L.Ed.2d 351 (1989); *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291–92, 108 S.Ct. 1811, 1817–18, 100 L.Ed.2d 313 (1988); *Chemical Manufacturers Ass'n v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985); *United States v. Boyle,* 469 U.S. 241, 246 n. 4, 105 S.Ct. 687, 690 n. 4, 83 L.Ed.2d 622 (1985); *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782.

While the majority obviously disagrees with me that this is the preferred construction of the Act's language, it goes much further, concluding that my construction (and the BIA's) lies entirely outside the realm of the reasonable because Congress must have clearly meant the term "conditions" to refer to the physical state of the land. The majority apparently reaches its rigid conclusion as to the meaning of "conditions" by relying on a definition of the term in *Webster's Third New International Dictionary.* Maj. at 1317 (" 'Conditions' is defined as 'attendant circumstances: existing state of affairs.' "). But, as the majority is no doubt aware, this is only one of half-a-dozen definitions *Webster's* offers for the term; among the other definitions is the one that forms the premise of the BIA's regulation: something "offered or agreed to in a contract, deal, or agreement." *Webster's Third New International Dictionary* 473 (1976). Indeed, *Webster's* exemplifies use of the term with a phrase that could have been written with this case in mind: "under the *terms* of the ... treaty." *Id.* (emphasis in original).

B. Because the 1945 Act does not clearly require the result adopted by the majority, we must defer to the BIA's interpretation so long as it's reasonable. To my mind, it is. An agency's construction of a statute need not be the only permissible one; it need only be "sufficiently rational." *Chemical Manufacturers Ass'n v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985); *see also American Paper Inst., Inc. v. American Elec. Power Serv. Corp.,* 461 U.S. 402, 422–23, 103 S.Ct. 1921, 1932–33, 76 L.Ed.2d 22 (1983). As discussed above, a common definition of "conditions" is the terms, provisions or provisos of a treaty or contract. This is enough for the BIA's regulation to pass muster under *Chevron.*

Because the BIA's regulation is valid, whether the Indians are permitted to maintain permanent structures on the in-lieu sites depends entirely on whether the treaties permitted them to do so. I am therefore unable to agree with the majority's holding that the treaties are merely "[a]nother consideration in ascertaining Congress' intent" in enacting the 1945 Act. Maj. at 1318. As I see it, examining the treaties is the *only* way to interpret the 1945 Act.

## II

Unlike its position as to the 1945 Act, the majority admits that the meaning of the 1855 treaties is not clear. *See* maj. at 1318. Thus, there can be no disagreement about the fact that we are required to defer to the BIA's interpretation of the treaties so long as it is reasonable: " '[A]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.' " *Stuart,* 109 S.Ct. at 1193 (quoting *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 184–85, 102 S.Ct. 2374, 2379–80, 72 L.Ed.2d 765 (1982)); *see also Kolovrat v. Oregon,* 366 U.S. 187, 194, 81 S.Ct. 922, 926, 6 L.Ed.2d 218 (1961); *Factor v. Laubenheimer,* 290 U.S. 276, 295, 54 S.Ct. 191, 196, 78 L.Ed. 315 (1933). As with an administrative interpretation of a statute, an agency's construction of a treaty need not be the only permissible one; it need only be "sufficiently rational." *See Chemical Manufacturers Ass'n,* 470 U.S. at 125, 105 S.Ct. at 1107; *see also American Paper Inst.,* 461 U.S. at 422–23, 103 S.Ct. at 1932–33. Once again, however, the majority overlooks this important rule of administrative law, interpreting the treaties as though the BIA regulations did not exist.

The majority does not contend that the BIA regulations are "arbitrary, capricious, or manifestly contrary" to the 1855 treaties. Nor could it. Under the treaties, the Indians agreed to take up residence on a reservation and to relinquish all rights to their native tribal lands, including their lands along the Columbia River, in exchange for various benefits described in the majority opinion. *See* maj. at 1314; *see also United States v. Winans,* 198 U.S. 371, 379, 25 S.Ct. 662, 668, 49 L.Ed. 1089 (1905). The only exception relevant here is that the Indians retained "the exclusive right of taking fish" from their traditional

fishing grounds and to erect "suitable" or "temporary" "buildings" or "houses" at those sites for the storing and curing of fish. *See, e.g.,* Treaty with Indians in Middle Oregon, June 25, 1855, 12 Stat. 963–64 (1859); Treaty with the Yakima, June 9, 1855, 12 Stat. 951, 952 (1859). This exception, however, was strictly limited. Unlike reservation land, the treaty fishing grounds did not belong to the Indians; title was held in the name of the United States, which was obligated to maintain the land for the use and benefit of the Indians subject only to the express terms of the treaties. *See Whitefoot v. United States,* 293 F.2d 658, 663, 155 Ct.Cl. 127 (1961); *see also Winans,* 198 U.S. at 381, 25 S.Ct. at 664. Indeed, twice the Supreme Court has considered the Indians' rights to use the Columbia River fishing grounds, and twice the Court has indicated that the treaties reserve for the Indians no more than the right to fish and to build structures directly related to their fishing activities. *See Seufert Bros. v. United States,* 249 U.S. 194, 197, 39 S.Ct. 203, 204, 63 L.Ed. 555 (1919); *Winans,* 198 U.S. at 371, 25 S.Ct. at 662.[2]

The BIA regulations are entirely consistent with the treaties: First, they restrict the use of the in-lieu sites to Indians and their families. *See* 25 C.F.R. § 248.2 (1989). Second, they limit facilities on the in-lieu sites to tents, tepees, campers and mobile trailers, and require that all such facilities "be removed from the sites at any time the owners thereof are not actively engaged in fishing, drying fish, or processing fish by other means." *See* 25 C.F.R. § 248.6 (1989). Was it arbitrary or capricious for the BIA to interpret the words "temporary" and "suitable" as meaning only while the Indians are engaged in fishing activities? Of course not. If anything, the BIA's interpretation is far more in step with the treaties and statute than is the plaintiffs' preferred reading, which would allow a small number of Indians to live at the in-lieu sites year-round, to the exclusion of other Indians who would come there seasonally to fish.[3] Moreover, the majority's interpretation overlooks the fact that the curing and drying of fish has historically been a seasonal activity along the Columbia River. *See Seufert Bros.,* 249 U.S. at 197, 39 S.Ct. at 204; *Whitefoot,* 293 F.2d at 664; Affidavit of Dr. Eugene Hunn, E.R. 60 at 7, 13.[4] A "temporary" or "suit-

---

**2.** In *Winans,* the Court held that the Indians were given "the right of taking fish at all usual and accustomed places," and the right "of erecting temporary buildings for curing them." The contingency of the future ownership of the lands, therefore, was foreseen and provided for—in other words, the Indians were given a right in the land—the right of crossing it to the river—the *right to occupy it to the extent and for the purpose mentioned.* No other conclusion would give effect to the treaty.

198 U.S. at 381, 25 S.Ct. at 664 (emphasis added). Similarly, *Seufert Bros.* held that the Indians'

understanding of the treaty was that they had the right to resort to these fishing grounds and make use of them in common with other citizens of the United States,—and *this is the extent of the right that is secured to them by the [treaty].*

249 U.S. at 198–99, 39 S.Ct. at 205, (emphasis added).

**3.** It does not matter, of course, whether the BIA's interpretation of the treaties is the most plausible, *see Chemical Manufacturers,* 470 U.S. at 125, 105 S.Ct. at 1107, but, as a matter of fact, here it is. As the majority recognizes, the only reference in the treaties to structures describes "[suitable houses or temporary buildings] for

curing [fish]." Maj. at 1315. There is absolutely *no* reference in the treaties or implementing legislation to erecting or maintaining structures for the purpose of year-round living. Yet, that is precisely what plaintiffs claim the right to do here.

As the majority also recognizes, plaintiffs use the structures in question for purposes totally unrelated to the storing or curing of fish: "Some live in houses or trailers which remain year-round, while others use the sites for year-round storage of trailers and other personal property." Maj. at 1315. I have little difficulty concluding that the BIA's regulations, which limit permissible structures to temporary buildings and fish drying facilities, are far more in tune with the treaty language than the expansive interpretation proffered by the plaintiffs and approved by my colleagues. The purpose of the treaties was to create a right for all Indians to enjoy, not just the lucky few who have staked out permanent residences. *See Whitefoot,* 293 F.2d at 663.

**4.** Dr. Hunn's affidavit, on which my colleagues rely, hardly supports their position. As quoted by the majority, Dr. Hunn claimed that "the fishing practices of [the] Indians at the time of the treaties involved spending *six to eight*

able" structure therefore could easily be used for carrying out these activities even if it couldn't be occupied year-round. I therefore don't understand how the majority manages to expand the Indians' limited rights under the treaties to include the right to maintain permanent residences and to engage in activities completely unrelated to fishing.

I don't dispute the majority's observation that "temporary" and "suitable" may have many meanings other than those chosen by the BIA, but the Supreme Court's decisions in *Chevron, Stuart* and *Chemical Manufacturers* render all of these other meanings irrelevant. Thus, contrary to the majority's assertion, it doesn't matter that "temporary" may also reasonably be interpreted to mean for a whole year, or a decade, or even as long as Ozymandias thought his statue would last. It is likewise of no consequence that "houses" and "structures" may mean everything from a drying shed to the Taj Mahal. " '[W]e need not find that [an agency's] construction is the only reasonable one, or even that it is

the result we would have reached had the question arisen in the first instance in judicial proceedings.' ... We need only conclude that it is *a* reasonable interpretation of the relevant provisions." *American Paper Inst.,* 461 U.S. at 422–23, 103 S.Ct. at 1932–33 (quoting *Unemployment Compensation Comm'n v. Aragon,* 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946)) (emphasis in original).

Under the BIA regulations, the Indians may maintain structures on the sites—limited to camping and fish drying facilities—so long as they are "actively engaged in fishing, drying fish, or processing fish by other means." 25 C.F.R. § 248.6. Although the majority may prefer a different interpretation of the treaties, the BIA's interpretation clearly is not unreasonable and, if deference means anything, we may not second-guess it.[5]

## III

The majority errs again by invoking various doctrines that, supposedly, require us

---

*months* each year at the fishing and hunting sites." *See* maj. at 1319 (emphasis added). This provides no support for the conclusion that the Indians may reside permanently at the in-lieu sites.

**5.** Pursuing its de novo interpretation of the statute, the majority premises its analysis on an extensive quotation from a recent account of Lewis and Clark's 1805 Columbia River expedition. *See* maj. at 1314 (quoting D. Lavender, *The Way to the Western Sea* 280–81 (1988)). References to works of literature in judicial opinions are not uncommon, and there is nothing wrong with the practice so long as it is used merely as a rhetorical flourish or to provide local color. *See, e.g., Kenaitze Indian Tribe v. Alaska,* 860 F.2d 312, 318–20 (9th Cir.1988) (Noonan, J., concurring), *cert. denied,* —— U.S. ——, 109 S.Ct. 3187, 105 L.Ed.2d 695 (1989). Here, however, the majority seems to rely on the passage, which describes certain structures used by the Indians along the Columbia River, to define the very question presented to us on appeal: "This case requires us to determine whether, in the Treaties of 1855, the Indians ceded their right to maintain structures of the same general type [as those described by Lavender]." Maj. at 1314.

The difficulties with the majority's use of this extraneous material are manifold. Most fundamentally, it is not in the record. This means that neither the district court nor the administrative agency had an opportunity to consider it; the government had no opportunity to present evidence in rebuttal. Further, it is not clear that, if presented, this evidence could have been admitted. As it appears to be Lavender's account of what Lewis and/or Clark reported, it involves at least two levels of hearsay. Moreover, there is a serious relevancy problem: The account describes the situation as it existed in 1805, half a century before the 1855 treaties were signed. There is no indication that the Indians' practices remained unchanged for five decades when life in the Pacific Northwest changed profoundly as the result of an enormous influx of white settlers. This influx displaced many Indians and often interfered with traditional tribal practices, including those that may have dated "from time immemorial."

In light of these doubts about the relevance and admissibility of the Lavender material, I must disagree with the majority's implicit assertion that, immediately prior to the signing of the 1855 treaties, the Indians maintained permanent or semipermanent structures on the shores of the Columbia River on a year-round basis. We just don't know. The only other evidence of the Indians' practice at that time is the affidavit of Dr. Eugene Hunn, who reported that the Indians' fishing season lasted only "six to eight months each year." *See* maj. at 1319. This hardly supports the conclusion that the Indians maintained permanent residences at the fishing grounds.

to treat the BIA's interpretation of the treaties with less-than-normal deference. Were any of these narrow exceptions to the *Chevron* and *Stuart* rules applicable, the majority's approach would still be flawed because it gives the BIA's interpretation no deference whatsoever. Even when deference is weakened, the agency's determination commands *some* respect; it can't just be ignored. *See NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335, 351, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978). Yet, having listed various reasons why the BIA is entitled to diminished deference, the majority proceeds to interpret the treaties entirely de novo. This is not diminished deference; it is total disregard.

In any event, none of the majority's reasons for denigrating the BIA's efforts are valid. Indeed, if taken at face value, the opinion seriously undermines the rule of judicial deference for most of what is in the Code of Federal Regulations.

A. The majority first contends that the BIA "impliedly construed the treaties to allow [permanent] structures" by waiting until 1969 to promulgate its current regulations. Maj. at 1317.[6] However, it is black letter law that the absence of a comprehensive administrative program in the past does not diminish an agency's current regulatory authority. *See United States v. Morton Salt Co.*, 338 U.S. 632, 647–48, 70 S.Ct. 357, 366–67, 94 L.Ed. 401 (1950); *Cooley v. F.E.R.C.*, 843 F.2d 1464, 1470 (D.C. Cir.1988), *cert. denied*, 488 U.S. 933, 109 S.Ct. 327, 102 L.Ed.2d 344 (1988) ("even a prolonged failure to assert an agency power does not destroy it"). In determining the degree of deference owed an agency's current interpretation of a statute or trea-

ty, the proper question is whether the agency has been capricious in exercising its regulatory authority, not whether it has failed to exercise it at all until recently. "[U]nquestioned powers are sometimes unexercised from lack of funds, motives of expediency, or the competition of more immediately important concerns." *Morton Salt*, 338 U.S. at 647–48, 70 S.Ct. at 366–67.

During the late 1960's the BIA realized that permitting Indians to build permanent or semipermanent living quarters had created two significant problems. First, local health authorities complained that the structures were unsafe and unsanitary. *See* Letter from Charles P. Corke, Deputy Asst. Comm'r of Indian Affairs, to Sen. Robert W. Packwood, May 26, 1969, *reprinted in* Affidavit of Peter A. Parnickis, Sept. 15, 1987, Ex. 40 ("Parnickis Affidavit"). Although earlier BIA regulations had required all structures on the in-lieu sites to comply with state and local health and building codes, *see* 25 C.F.R. § 255.6, they had not achieved this result. According to the BIA:

Subsequent study indicated the impracticality of bringing permanent living quarters into compliance with such restrictions on these sites. It was, therefore, concluded that year-round occupancy should not be permitted and that the sites should be utilized only for the purpose for which they were acquired. The amendments of February 11, 1969, were, therefore, adopted.

Parnickis Affidavit, Ex. 40, at 2.

Second, the BIA found that allowing permanent residences had denied many Indians access to the in-lieu fishing sites because a few tribal members monopolized a

---

6. Indeed, the BIA had *explicitly* construed the treaties to allow such structures in earlier regulations. *See* 25 C.F.R. § 255.6 (1968). That fact, however, should have little effect on the level of deference we accord to the BIA's present interpretation. "[A]lthough less deference may be in order in some cases in which [regulations] conflict with earlier pronouncements of the agency, ... substantial deference is nonetheless appropriate if there appears to have been good reason for the change." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 109 S.Ct. 1835, 1848, 104 L.Ed.2d 351 (1989)

(internal quotations and citations omitted); *Andrus v. Sierra Club*, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979); *Iron Workers*, 434 U.S. at 351, 98 S.Ct. at 660; *Mesa Verde Constr. Co. v. Northern Calif. Dist. Council of Laborers*, 861 F.2d 1124, 1135 (9th Cir.1988) (en banc). So long as there was a "well-considered basis for the change, the new regulation is entitled to substantial deference." *Robertson*, 109 S.Ct. at 1849. As the discussion following in the text plainly illustrates, the BIA had good reason for adopting its current regulations.

substantial portion of the limited areas intended for use by all Indian fishermen. *See Sohappy v. Hodel*, No. 86–715–JU, at 28 (D.Or. Oct. 23, 1987) (Magistrate's Findings and Recommendation); Administrative Record (AR), at 87 (Affidavit of Stanley Speaks, Portland Area Director, BIA). Approximately 13,000 Indians were eligible to use the limited area available at the sites. Yet a handful of individuals claimed the right to use the sites year-round as their principal residences and for storage of personal property.[7] These individuals weren't there primarily to catch fish; they had set up permanent living quarters, to the exclusion of other Indians who would come there only to fish.

The BIA quite reasonably concluded that this practice was inconsistent with the treaties and the 1945 Act which clearly contemplated that fishing rights be enjoyed by *all* Indians. It therefore amended the regulations in 1969 to prohibit the erection or maintenance of structures on the in-lieu sites when the Indians were not engaged in fishing activities. *See* 33 Fed.Reg. 15,431–32 (1968). According to the BIA, the regulations were amended so that they would "comply with the intention of the language contained in the treaties and in the [1945 Act] authorizing the acquisition of the sites." *Id.* at 15,432. This was a perfectly rational reason for amending the regulation; we must therefore continue to give the agency's interpretation substantial deference. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 109 S.Ct. 1835, 1848, 104 L.Ed.2d 351 (1989).

The majority's contrary conclusion is unsettling. Agencies may see no immediate need to draft regulations, waiting perhaps to learn from experience. Under the majority's view, the agency is then deemed to have approved the status quo as if it had been embodied in a regulation, and any later regulations will be subject to stricter

standards of review. There is no authority for this rationale; its potential for mischief should not be underestimated.

B. Equally troubling is the majority's assertion that because "the government made no attempt to disturb the Indians in their occupancy of the lands" prior to 1969, the government is barred from doing so now. *See* maj. at 1320. There is no support in the record for the majority's claim. As early as 1931, the Superintendent of the Yakima Indian Agency informed the Yakima Tribe of his concern that some individual Indians had taken up permanent residence at the Columbia River fishing grounds in violation of the treaties:

> I have been advised by various Indians of disagreements and quarrels arising over fishing locations. I have reviewed the office files concerning fishing and fishing rights among the Yakimas, and notwithstanding that there seems to be a traditional understanding among the members of the tribe that locations occupied by forefathers give families right of succession, I do not find in the treaty or the files any information giving any particular member of the tribe any specific location, or the right to acquire the same.
>
> The conclusion, therefore, must be that all have rights "in common"; that all members of the Yakima tribe have equal rights.
>
> . . . .
>
> *The effort of certain members of the tribe to monopolize the fishing privileges is frowned upon and does not meet with the approval of this office.*
>
> It has also come to my attention that certain Indians have threatened others in connection with fishing locations. Such threats are [reprehensible].

*Whitefoot*, 293 F.2d at 669 (quoting Letter of the Superintendent of the Yakima Indian Agency (Apr. 23, 1931)) (emphasis added).[8]

---

7. The administrative record contains much evidence of the extent of permanent improvements at the in-lieu sites—including color photographs showing private residences, electrical connections and "No Trespassing" signs. *See* AR at 116–25 (Affidavit of Gerald F. Rodgers). This evidence establishes quite clearly that the permanent structures maintained by plaintiffs interfere severely with access by other Indians to the tribal fishing areas. No one disputes this.

8. Moreover, we know nothing at all about the three-quarters of a century between 1855 and 1931. Because the treaties themselves merely

Thus, the majority's assertion—without reference or citation—that the agency hewed to a particular interpretation of the treaty until 1969 is really more of a guess than a fact, and apparently a wrong guess. As far as the record shows, the two-year period during which the BIA officially permitted permanent structures—1967 through 1969—was an anomaly, one that the agency quickly realized was at loggerheads with the philosophy of the treaties. In any event, as discussed above, an agency's prior views have little relevance to how courts should treat the agency's current regulations.

The rule that an agency is owed less deference when it changes its position over time must, of necessity, be closely cabined. Otherwise, it will completely undermine the fundamental reason Congress delegates regulatory responsibility to administrative agencies—the unique ability of agencies to adjust their regulations readily in light of experience, changed circumstances and newly acquired information. Agencies are far better suited than courts to "reconcil[e] conflicting policies" and to have a "full understanding" of difficult issues underlying the interpretation of a statute or treaty. *United States v. Shimer*, 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961). Part and parcel of an agency's authority to administer a statute, therefore, is the responsibility to monitor and adjust regulations over time. When the agency has, in the Supreme Court's words, a "good reason for the change," *Robertson*, 109 S.Ct. at 1848, it is doing precisely what Congress meant for it to do, and is entitled to its full measure of deference from the courts.

The majority has interpreted this narrow exception to the rule of agency deference in a way that will seriously erode the flexibility and adaptability agencies need in discharging their duties. By giving conclusive weight to the BIA's pre-1969 practice, the majority gives far too broad a compass to this narrow exception to the rule of agency deference. The majority's analysis opens the door for all sorts of creative challenges to agency regulations, and could well make agencies wary about promulgating new regulations or amending existing ones. Unlike the majority, I am unable to square this approach with the Supreme Court's and our own pronouncements on the issue, and I suspect it will not survive the test of time.

C. The majority also takes stock in the canon of statutory and treaty construction that courts generally should construe ambiguous language in favor of the Indians. By doing so, it misperceives the scope of this canon and creates a conflict with numerous decisions of our court, as well as those of other circuits.

1. "While this court has recognized this canon of construction [in favor of Indian interests], it has also declined to apply it in light of competing deference given to an agency charged with [a] statute's administration." *Haynes v. United States*, 891 F.2d 235, 239 (9th Cir.1989) (citations omitted); *see also Blackfeet Indian Tribe v. Montana Power Co.*, 838 F.2d 1055, 1057–59 (9th Cir.), *cert. denied*, 488 U.S. 828, 109 S.Ct. 79, 102 L.Ed.2d 56 (1988), *Cook Inlet Native Ass'n v. Bowen*, 810 F.2d 1471, 1475–77 (9th Cir.1987); *Shields v. United States*, 698 F.2d 987, 990–91 (9th Cir.), *cert. denied*, 464 U.S. 816, 104 S.Ct. 73, 78 L.Ed.2d 86 (1983); *Assiniboine & Sioux Tribes v. Nordwick*, 378 F.2d 426, 432 (9th Cir.1967), *cert. denied*, 389 U.S. 1046, 88 S.Ct. 764, 19 L.Ed.2d 838 (1968).[9] Thus, even when an agency's interpretation of ambiguous statutory or treaty language

---

guaranteed to the Indians exclusive fishing rights as against non-Indians, it is unclear whether any governmental agency would have had reason to get involved in disputes among Indians about whether some were entitled to occupy the beachfront to the exclusion of others.

**9.** While we do not always defer to administrative interpretations of statutes and treaties when the rights of Indians are involved, this is because the administrative interpretations may conflict with clear statutory or treaty language. As noted previously, when statutory or treaty language is clear, a court may engage in de novo interpretation notwithstanding the existence of an administrative regulation.

For example, in *Preston v. Heckler*, 734 F.2d 1359 (9th Cir.1984), we did not defer to the Secretary of Health and Human Services' interpretation of a provision of the Indian Preference Act. *Preston* relied on the fact that the

affects the rights of Indians, the interpretation will be upheld "[s]o long as the [agency's] interpretation is reasonable." *Haynes*, 891 F.2d at 239. As in most agency interpretation cases, "[r]egardless of whether it is the better interpretation, a reasonable interpretation must be upheld." *Id.*

The majority's analysis also runs contrary to that of our sister circuits. For example, in *National Indian Youth Council, Intermountain Indian School Chapter v. Bruce*, 485 F.2d 97 (10th Cir.1973), *cert. denied*, 417 U.S. 920, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974), the Tenth Circuit upheld the district court's dismissal of a complaint brought by an Indian group seeking to close a BIA operated Navajo boarding school. Among the group's claims was that the school's operation violated the Navajo Treaty of 1868. *Id.* at 98. While dismissed on jurisdictional grounds, *National Indian* clearly emphasized the BIA's broad discretion to interpret the statutes and treaties the agency enforces:

> [G]reat deference should be afforded to interpretations by the agency charged with the duty of carrying out statutory mandates. Credence should be particularly accorded those who are working with treaties. Courts cannot substitute their judgment for that of those working with Indians, empowered to exercise discretion.

*Id.* at 99 (citations omitted).

Nowhere does the majority opinion manifest "great deference" to the BIA's judgment. Rather, it establishes a rule that courts may bypass the views of a specialized agency when the agency's position conflicts with what, in the court's view, is in the best interests of Indians.

It is true that Indian treaties generally are to be interpreted as the Indians would have construed them. Nevertheless, such treaties may never "be rewritten or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties." *Choctaw Nation v. United States*, 318 U.S. 423, 432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943).[10]

2. Even if the rule that ambiguous treaty language must be read in favor of the Indians could be invoked to defeat the BIA regulation, the rule would be inapplicable here. The rule of construction on which the majority relies is designed to assure fairness when the agency has adopted an interpretation that favors non-Indians at the expense of Indians. It cannot be invoked every time one Indian or a group of Indians challenges a regulation adopted by the BIA. *See Sisseton–Wahpeton Sioux Tribe v. United States*, 895 F.2d 588, 597 (9th Cir.1990) (there is no basis for invoking traditional doctrines that favor the interests of Indians "where the claim essentially pits one group of Indians against another"). Where, as here, *everyone* who could conceivably benefit from the allocation of fishing rights is an Indian, there is

Secretary's "interpretation [was] contrary both to the [Act's] language and purpose." *Id.* at 1371. Although *Preston* discussed the rule of statutory construction favoring the rights of Indians, it did so only in the context of determining whether a portion of the Indian Preference Act had been repealed by another Act of Congress. *Id.* at 1369. It did not rely on this rule of construction in invalidating the Secretary's regulation.

Likewise, in *Barona Group of the Capitan Grande Band of Mission Indians v. American Management & Amusement, Inc.*, 840 F.2d 1394, 1405 (9th Cir.1987), *cert. dismissed*, 487 U.S. 1247, 109 S.Ct. 7, 101 L.Ed.2d 958 (1988), we upheld a district court's refusal to defer to a BIA interpretation of 25 U.S.C. § 81, which governs contracts involving the private use of Indian lands. The court found that the BIA's interpretation was "directly contrary" to prior interpretations of that section. *Id.* at 1405. As with *Preston*, *American Management* was decided independent of the fact that Indian rights were involved.

10. The majority's assertion—that "nothing in the words of the treaties indicates that wooden houses are impermissible, or that any structures must be removed whenever the Indians are not actively engaged in fishing," maj. at 1318—doesn't address the issue. I do not dispute that "temporary" structures may be made of wood, or that the Indians were not required to remove them board by board at the end of each fishing season; what I question is whether the Indians were entitled to take up permanent residence and to use the in-lieu sites for numerous activities completely unrelated to fishing.

no pro-Indian or anti-Indian position.[11] In these circumstances, the agency is an arbiter between the interests of various groups of Indians and its interpretation is entitled to full deference.

The majority's mistake is in assuming that, because some Indians challenge the regulation in question, the regulation must be anti-Indian. This is simply not so. Three years after the BIA promulgated the current regulation prohibiting permanent structures, the leaders of a number of the tribes entitled to fish at the in-lieu sites expressed their support for the BIA's regulation, resolving that the sites "be preserved for the use as fishing and camping sites of Indian Tribes having treaty fishing rights on the Columbia River and that improvement of the sites be consistent with such preservation and that *no housing facilities or permanent settlements be constructed on the 'in-lieu' sites.*" Res. No. 3567, Tribal Council of the Confederated Tribes of the Warm Springs Reservation of Oregon, Feb. 4, 1972, *reprinted in* Parnickis Affidavit, Ex. 55, at 23 (emphasis added). According to tribal leaders, the sites were "established for the use of the Indian Tribes having treaty fishing rights ..., and not for the exclusive use or benefit of any individuals or for use as permanent settlements." *Id.*

Indians, like other groups, have differences of opinion: Those Indians who have staked out permanent beach-front living quarters dislike the regulation because it requires them to go live elsewhere. Other Indians, who want a fair opportunity to compete for fish, have taken the opposite view. This does not make the BIA regulation any more anti-Indian than an FAA regulation would be anti-airline because it is challenged by some airlines, or an NHTSA automobile safety standard would be anti-consumer because it is challenged by some consumers. It is the administrative agency's function to assay the interests of the entire community—the BIA here published the relevant regulations in

the Federal Register and otherwise complied with the APA's requirements for notice and comment—and then make a judgment that serves the general good, not the privileged few. It is for this reason that Congress empowers an administrative agency—not individual airlines, consumers or Indians—to set policy.

Again, the majority's analysis is contrary not merely to established principles of administrative law, but also to case law from this circuit. In *United States v. Eberhardt*, 789 F.2d 1354 (9th Cir.1986), we upheld a BIA regulation that limited the right of Indians to engage in certain types of fishing activities. The regulation prohibited Indians from engaging in activities that, absent its existence, they would have been entitled to pursue. Nevertheless, we construed the regulation as "designed to manage the fishery for the benefit of the Indians, not to extinguish any reserved tribal fishing rights." 789 F.2d at 1361. Thus, simply because some Indians were not so happy with the regulation did not mean that it was contrary to the interests of Indians in general.

By validating the plaintiffs' claim that the agency's regulation here is entitled to little deference because it is anti-Indian, the majority has emasculated the BIA's entire regulatory program. I can imagine few, if any, BIA regulations to which *some* Indians might not object. Do we then hold the regulations to be anti-Indian and refuse to grant the BIA the proper degree of deference? I should think not, but that is precisely the implication of the majority's analysis.

## IV

Finally, the majority errs in its remand instructions. The majority concludes that "[i]n light of the evidence and the clear expression of congressional intent that the in-lieu sites were made subject to the same conditions that existed on the flooded

---

11. As noted, the regulations, like the statute and treaties, grant exclusive fishing rights to the Indians. Non–Indians may not fish at the in-lieu sites at all. Thus, only other Indians will benefit if the plaintiffs are required to vacate or remove their permanent structures; only other Indians will suffer if they're not.

lands, we reverse the district court's grant of summary judgment on this issue." Maj. at 1320. I question this conclusion. As the majority correctly holds, summary judgment is appropriate when there exists no genuine issue of material *fact.* Maj. at 1316. The interpretation of a statute or treaty, however, is a question of *law. Central Montana Elec. v. Administrator of Bonneville Power,* 840 F.2d 1472, 1476–77 (9th Cir.1988); *United States ex rel. Chunie v. Ringrose,* 788 F.2d 638, 643 n. 2 (9th Cir.), *cert. denied,* 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 705 (1986); *United States v. Vetco Inc.,* 691 F.2d 1281, 1285 (9th Cir.), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981). This is true even when the rights of Indians are involved. *See Ringrose,* 788 F.2d at 643 n. 2; *Citizen Band of Potawatomi Indians of Okla. v. United States,* 391 F.2d 614, 618–19, 179 Ct.Cl. 473 (1967), *cert. denied,* 389 U.S. 1046, 88 S.Ct. 771, 19 L.Ed.2d 839, 390 U.S. 957, 88 S.Ct. 1046, 19 L.Ed.2d 1152 (1968).

What exactly would the trial here involve? The district court has already examined a copious amount of factual information, including a lengthy administrative record. Moreover, assuming that the physical conditions of the treaty fishing grounds a half-century ago are relevant, it would be most difficult for the court to make further inquiries into their conditions, let alone into the subjective view of the treaty negotiators, as they are all long dead. And, none of this would change the fact that the only issue for this court to consider is whether the BIA's interpretation of the statute and treaties is reasonable.

To my mind, all that remains to be done, therefore, is for this court to decide whether the district court correctly found the BIA's regulation valid. Because this is purely a question of law, I believe we are now in the position to render a final judgment. Consequently, I would affirm the district court's grant of summary judgment in favor of the Department of the Interior. The BIA's regulations are, as a matter of law, neither arbitrary nor irrational.

Conclusion

I regret that I am unable to join the majority's disposition of this matter. This case is not just about drying sheds and fish; it's about the proper level of respect a court must show to those entrusted by Congress to administer Indian affairs. In protecting the private interests of a few individual Indians, the majority has severely hobbled the BIA in carrying out its statutory mission of protecting Indians as a group; it has replaced the discretion we normally afford agencies with a rule that permits judicial second-guessing of experts. I can only wonder what mischief lies ahead when well-established rules of administrative law are set aside so that courts may supplant the proper role of the executive branch.